UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VIOLET FRYER,<br><br>               Plaintiff,<br><br>   -against-<br><br>OMNICOM MEDIA GROUP, OMD USA LLC, and<br>MICHAEL ATKIN, in his individual and official<br>capacities,<br><br>               Defendants. | 09 Civ. 9514 (WHP)<br><br>**DECLARATION OF**<br>**GUY R. COHEN** |

**GUY R. COHEN** declares, under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am a member of Davis & Gilbert LLP ("D&G"), attorneys for defendants Omnicom Media Group, OMD USA LLC ("OMD") and Michael Atkin (collectively, "Defendants"). I am Defendants' lead attorney in this employment discrimination lawsuit, which concerns OMD's termination of plaintiff Violet Fryer's employment in a June 2009 reduction-in-force ("RIF"). I submit this declaration in support of Defendants' Motion to Dismiss the Complaint and for Sanctions (the "Motion") against Fryer and her lawyers, Scott Gilly and Gregory Filosa of Thompson Wigdor & Gilly LLP ("TWG"), as well as TWG itself.

**Background**

2. Defendants contend in the Motion that Fryer and her lawyers engaged in egregious misconduct and abuse of the discovery process that warrants both dismissal of this lawsuit and substantial monetary sanctions. Throughout this litigation, and until October 26, 2010, we (Defendants' attorneys) believed that Fryer had been unable to obtain a new job following the RIF based on, among other things: (a) Fryer's October 7, 2010 deposition

testimony; (b) her expert report on damages; (c) communications with her lawyers, (d) and her failure to produce any documents indicating that she had been offered or had accepted a new job.

3.      On October 26, 2010, however, an OMD employee informed D&G that Fryer had obtained a job with Kraft Foods Corporation ("Kraft"). As of October 26, neither Fryer nor her attorneys had disclosed any information concerning a job with Kraft. This was the first time D&G had received any information about Fryer's receiving a new job. In fact, when I received this information on October 26, I assumed that Fryer must have obtained this job in the two-and-a-half weeks following her October 7 deposition because I was sure that she was upset during her deposition because of her inability to secure a new job.

4.      On October 27, 2010, I contacted Filosa by e-mail concerning our newly obtained information about Kraft. I wrote, in part, as follows: "It's our understanding that Ms. Fryer is no longer unemployed. If our understanding is correct, Ms. Fryer needs to immediately supplement her disclosures." A copy of my October 27 e-mail to Filosa is attached hereto as Exhibit 1.

5.      Since October 27, Fryer and her lawyers have belatedly disclosed through document production, deposition testimony and stipulation the following information, none of which had been disclosed prior to October 27: (a) on September 17, 2010, Fryer received and accepted a job offer from Kraft; (b) on September 17, 2010, Fryer told her lawyers that she had received and accepted a job offer from Kraft; (c) on September 10, 2010, Fryer received a job offer from UM (formerly Universal McCann); (d) on September 10, 2010, Fryer told her lawyers about UM's job offer; (e) Fryer accepted UM's job offer several days after receiving it, but rescinded her acceptance on September 17, 2010; (f) Fryer's first day with Kraft was October 11, 2010, just two business days after her October 7 deposition; and (g) Fryer's starting salary with Kraft was $130,000, which exceeded her OMD salary as of the date of the RIF.

6.    Defendants contend that Fryer and her lawyers deliberately withheld this information in a wrongful effort to improve their negotiating position while the parties were actively discussing settlement.

**OMD's Discovery Requests**

7.    On April 20, 2010, OMD served its First Requests for Production of Documents (the "Document Requests"). The Document Requests are attached hereto as Exhibit 2.

8.    Through the Document Requests, OMD requested production of, among other things, all documents concerning: (a) Fryer's efforts to mitigate her damages; (b) Fryer's efforts to secure employment following the termination of her employment with OMD; (c) each job that Fryer held since the termination of her employment with OMD; and (d) income that Fryer received from any such job. *See* Ex. 2 (Document Request Nos. 27, 30-33).

9.    Fryer initially produced documents responsive to OMD's document requests, and Fryer supplemented her document production on September 7, 2010 and October 5, 2010.

10.    In response to the Document Requests, as of October 27, 2010, Fryer had not produced any documents reflecting that she had received or accepted job offers from Kraft, UM, and/or any other person or entity.

**Fryer's Expert Report**

11.    On September 27, 2010, Fryer served an expert report on damages entitled "An Appraisal of Economic Loss to Violet Fryer" and dated September 22, 2010 (the "Report"). A copy of the Report, along with Filosa's September 27, 2010 e-mail transmitting the Report to my colleague, Shira Franco, is attached hereto as Exhibit 3.

12.    In the Report, Fryer's experts opined that her past and future economic loss fell between $354,952 and $1,073,071. *See* Ex. 3, at p. 15. This conclusion necessarily flowed from

their understanding that Fryer was unemployed and would likely remain unemployed for years to come. The Report did not indicate that Fryer would be commencing employment with Kraft on October 11 and did not contain a single reference to either Kraft or UM.

13.      Because Fryer's lawyers served the Report under Rule 26(a) of the Federal Rules of Civil Procedure, I understood the Report to amount to an affirmative representation by Fryer's lawyers that, to the best of their knowledge, Fryer had not obtained a new job as of September 27, 2010.

**Fryer's Lawyers Used the Expert Report**
**To Improve Fryer's Negotiating Position**

14.      After serving the Report, Fryer's lawyers repeatedly used its damages analysis as a benchmark to support her settlement demands. For example, on September 28, 2010, just one day after we received the Report, Filosa sent us a letter containing a settlement demand of $350,000 and contending that this demand was reasonable because it fell at "the bottom end of the range of Ms. Fryer's economic damages (i.e., $354,952 and $1,073,071) provided in the expert report which we recently forwarded to you." Filosa also stated that Fryer's offer would be withdrawn once OMD proceeded with her deposition, which was scheduled for October 7, 2010. A copy of Filosa's September 28, 2010 letter to Ms. Franco is attached hereto as Exhibit 4.

15.      Following receipt of this letter, I had a number of telephone conversations with Filosa about settlement. OMD made several offers to settle the case. In determining how much to offer, we (Defendants and their counsel) relied in good faith on the premise supporting the Report, i.e., that Fryer had not found a new job and that, as a result, her economic loss could be substantial. During the course of my settlement negotiations with Fryer's lawyers, they never informed me that the Report's damages analysis was unsupportable because Fryer had received a new job. Indeed, they never told me that Fryer had gotten a new job.

4

**OMD's Rebuttal Report**

16.     Following receipt of the Report, we analyzed it carefully and determined that it was necessary to retain an expert witness to rebut Fryer's contention that her past and future economic loss potentially exceeded $1,000,000.  When we received the Report, the remaining discovery deadlines were as follows: (a) OMD's rebuttal report, although scheduled to be served on October 27, 2010 pursuant to the Court's September 8, 2010 Scheduling Order, was agreed by the parties to be due on November 3, 2010; and (b) all discovery was to be completed by November 26, 2010.  We retained Elizabeth Becker of National Economic Research Associates, Inc. to serve as OMD's expert witness, and OMD incurred substantial fees – both Ms. Becker's fees and D&G's fees – in preparing to respond to the Report.  OMD intended to focus its rebuttal report on establishing how long it should have taken Fryer to get a new job with a reasonably comparable salary.

17.     As of October 27, 2010 – just one week before OMD's rebuttal report was due – neither Fryer nor her attorneys had informed us of any intention to revise, supplement or amend the Report based on Fryer's receipt of a new job.

18.     If I had known on September 27 (or any date thereafter) that Fryer had obtained a new job with Kraft with a starting salary exceeding what she earned with OMD, we never would have retained an expert witness to rebut the Report's conclusions.

**Fryer's False and Misleading Deposition Testimony**

19.     On October 7, 2010, I took Fryer's deposition.  During her deposition, Fryer gave false and misleading testimony about her efforts to find a new job.  Relevant excerpts from the transcript of Fryer's October 7, 2010 deposition are attached hereto as Exhibit 5; the DVD of Fryer's October 7 deposition is attached hereto as Exhibit 6, which is comprised of three separate

video files: File One, which runs from 10:09:27 a.m. to 12:27:56 p.m., File Two, which runs from 12:29:30 p.m. to 3:37:59 p.m., and File Three, which runs from 4:02:06 p.m. to 5:51:45 p.m.

20.     Following the deposition, as stated above, I was sure that Fryer had not obtained a new job based on: (a) her deposition testimony; (b) the Report; (c) the absence of documents concerning any new job; and (d) the failure of Fryer's lawyers to tell me that she had received a new job. In addition, I personally felt sympathy for Fryer, who appeared to be very upset about her inability to find a new job. As a result, after the deposition, I specifically told Filosa that, litigation aside, I hoped for Fryer to find a new job. I am almost certain that this conversation took place in a hallway at D&G's offices, but it's possible that it was in a telephone conversation shortly after the deposition. I don't recall what Filosa said in response, but I am certain that he did not say anything to disabuse me of my understanding that Fryer had not gotten a new job.

**Fryer's Belated Document Production**

21.     After we confronted Fryer's lawyers on October 27, 2010, Fryer belatedly produced documents concerning Kraft and UM on November 11, 2010 and December 13, 2010. These documents – produced either on November 11, 2010 or December 13, 2010 – establish the critical facts set forth in paragraphs 22 - 27 below.

22.     By September 7, 2010, Fryer had at least four interviews with UM. *See* September 7, 2010 e-mail from V. Fryer to G. Schenk, a copy of which is attached hereto as Exhibit 7. (VF 427-431, with relevant portion at VF 430).

23.     By September 14, 2010, Fryer had at least two interviews with Kraft. *See* Ex. 7 (September 14, 2010 e-mail from V. Fryer to G. Schenk at VF 428) and (September 2, 2010 e-mail from V. Fryer to M. Stewart at VF 431).

24.    No later than September 10, 2010, UM offered Fryer a job with a starting salary exceeding what she earned with OMD. *See* September 10, 2010 e-mail from B. Moll to V. Fryer attaching UM's offer letter, a copy of which is attached hereto as Exhibit 8. (VF 346-49).

25.    No later than September 17, 2010, Kraft offered Fryer a job with a starting salary exceeding what she earned with OMD. *See* September 17, 2010 e-mail chain between V. Fryer and G. Schenk, a copy of which is attached hereto as Exhibit 9. (VF433-436). *See also* Offer Letter from M. Stewart to V. Fryer, a copy of which is attached hereto as Exhibit 10. (VF 342).

26.    No later than September 17, 2010, Fryer rescinded the acceptance of her offer from UM. *See* e-mail chain between V. Fryer and B. Moll from September 17, 2010 to September 20, 2010, a copy of which is attached hereto as Exhibit 11. (VF 343-344).

27.    No later than September 26, 2010, Fryer accepted Kraft's offer. She commenced employment on October 11, 2010. *See* October 8, 2010 e-mail chain between J. Grosso and V. Fryer, a copy of which is attached hereto as Exhibit 12. (VF 437-439).

**Letter to Fryer's Counsel**

28.    On November 16, 2010, I wrote to Fryer's lawyers notifying them of the misconduct that had become apparent and that OMD intended to file a motion seeking sanctions for Fryer's misconduct. I also asked Fryer's lawyers to make a representation that they did not know about Fryer's misconduct. A copy of my letter to Filosa, dated November 16, 2010, is attached hereto as Exhibit 13.

**Letter from Fryer's Counsel**

29.    On November 24, 2010, Fryer's counsel responded to my November 16, 2010 letter by denying any wrongdoing by Fryer or her attorneys, and threatening to seek sanctions

against OMD and its counsel if a motion for sanctions were to be filed. A copy of Filosa's letter to me, dated November 24, 2010, is attached hereto as Exhibit 14.

**The Revised Report**

30.     On December 2, 2010, Fryer served a revised expert report ("the Revised Report"). The Revised Report capped her economic damages at $151,239 – essentially, Fryer's back pay from the date of the RIF through her start day with Kraft. A copy of the Revised Report is attached hereto as Exhibit 15.

31.     Since the Revised Report capped Fryer's economic damages at $151,239, OMD did not submit a rebuttal to the Revised Report.

**OMD's Letter to the Court**

32.     On December 22, 2010, I wrote a letter to the Court outlining Fryer's misconduct and requesting a pre-motion conference concerning this Motion. In the letter, I indicated that Fryer's attorneys had previously been asked to disclose whether they knew about Fryer's misconduct at the time it occurred, but that they declined to disclose such information. A copy of my letter to the Court, dated December 22, 2010, is attached hereto as Exhibit 16.

**Fryer's Letter to the Court**

33.     On December 30, 2010, Fryer wrote a letter to the Court seeking to justify Fryer's deposition testimony, the Report, and Fryers' lawyer's actions relating to settlement. A copy of Fryer's letter to the Court, dated December 30, 2010, is attached hereto as Exhibit 17.

**The Stipulation**

34.     On January 31, 2011, I sent an e-mail to Fryer's counsel notifying them that OMD would file a motion to compel if Fryer's attorneys did not stipulate to the dates that they learned of Fryer's job offers from UM and Kraft. In response to my e-mail, on March 10, 2011, Fryer's

attorneys stipulated as follows: (a) that TWG learned on September 10, 2010 that Fryer had received a job offer from UM; and (b) that TWG learned on September 17, 2010 that Fryer had received and accepted a job offer from Kraft.  A copy of an e-mail exchange documenting this stipulation is attached hereto as Exhibit 18.

**Fryer's March 11, 2010 Deposition Testimony**

35.     On March 11, 2011, OMD re-deposed Fryer.  During the March 11 deposition, Fryer testified for the first time about her job offers from Kraft and UM.  In addition, Fryer testified falsely yet again when she attempted to explain the testimony from her October 7, 2010 deposition.  Relevant excerpts from the transcript of Fryer's March 11, 2011 deposition are attached hereto as Exhibit 19; the DVD of Fryer's March 11 deposition is attached hereto as Exhibit 20, which is comprised of five separate video files: File One, which runs from 10:12:49 a.m. to 10:57:23 a.m., File Two, which runs from 11:04:46 a.m. to 12:03:10 p.m., File Three, which runs from 12:15:55 p.m. to 1:13:06 p.m., File Four, which runs from 2:19:14 p.m. to 3:17:01 p.m., and File Five, which runs from 3:25:44 p.m. to 3:56:39 p.m.


Executed on:   April 6, 2011
               New York, New York


                                    _____
                                         GUY R. COHEN