**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

VIOLET FRYER,                                         :
                                                     :
                          Plaintiff,                 :   Case No. 09 Civ. 9514 (WHP)
                                                     :
               v.                                    :
                                                     :
OMNICOM GROUP INC.; OMD USA LLC; and                 :
MICHAEL ATKIN, in his individual and official        :
capacities,                                          :
                                                     :
                          Defendants.                :
                                                     :
-------------------------------------------------------------------- X

### MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT AND FOR SANCTIONS

**THOMPSON WIGDOR & GILLY LLP**

Scott B. Gilly
Gregory N. Filosa
85 Fifth Avenue
New York, NY 10003
Tel: (212) 257-6800
Fax: (212) 257-6845
sgilly@twglaw.com
gfilosa@twglaw.com

*COUNSEL FOR PLAINTIFF*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 3

    Pre- and Post-Complaint Settlement Discussions ........................................................ 4

    Ms. Fryer's Initial Production of Job Search Documents ............................................ 5

    Ms. Fryer's Job Offer From UM .................................................................................. 6

    Ms. Fryer's Employment With Kraft Foods ................................................................ 6

    Plaintiff's September 22, 2010 Economic Damages Report ........................................ 7

    Ms. Fryer's October 7, 2010 Deposition .................................................................... 8

    Settlement Discussions Immediately Following Day One of Plaintiff's Deposition ... 10

    Plaintiff's Supplemental Production of Documents Concerning Her Job Search Efforts ............ 11

    Defendants' Threatened Sanctions and Settlement Posture ........................................ 12

    The Continuation of Ms. Fryer's Deposition .............................................................. 13

    TWG's Discovery Practices ........................................................................................ 14

ARGUMENT ....................................................................................................................... 15

    I.  Legal Standard For Dismissal and/or Sanctions ........................................... 15

    II.  Defendants' Request For Sanctions Should Be Denied ................................ 17

        A.  Defendants Fail to Establish Any Entitlement to Sanction of Dismissal .................. 19

        B.  A Sanction of Attorneys' Fees and Costs is Not Appropriate Against Plaintiff or Her Attorneys ..................................................................... 23

CONCLUSION .................................................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

*Aoude v. Mobil Oil Corp.*,
    892 F.2d 1115 (1st Cir. 2002) ........................................................................16

*Bobal v. Rensselaer Polytechnic Inst.*,
    916 F.2d 759 (2d Cir. 1990) ..........................................................................15

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991) .........................................................................................15

*Convolve, Inc. v. Compaq Computer Corp.*,
    223 F.R.D. 162 (S.D.N.Y. 2004)....................................................................23

*DAG Jewish Directories, Inc. v. Y & R Media, LLC*,
    No. 09 Civ. 7802 (RJH), 2010 WL 3219292 (S.D.N.Y. Aug. 12, 2010) ........18

*DLC Mgmt. Corp. v. Town of Hyde Park*,
    163 F.3d 124 (2d Cir. 1998) .....................................................................16, 18

*Friends of Animals, Inc. v. U.S. Surgical Corp.*,
    131 F.3d 332 (2d Cir.1997) ............................................................................19

*Mackler Productions, Inc. v. Turtle Bay Apparel Corp.*,
    No. 92 Civ. 5745 (RPP), 1997 WL 269505 (S.D.N.Y. May 21, 1997)......15, 17

*McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*,
    191 F. Supp. 2d 440 (S.D.N.Y. 2002) .................................................16, 17, 18

*Miller v. Time-Warner Comm'n, Inc.*,
    No. 97 Civ. 7286 (JSM), 1999 WL 739528 (S.D.N.Y. Sept. 22, 1999)..........18

*Passlogix, Inc. v. 2FA Technology, LLC*,
    708 F. Supp. 2d. 378 (S.D.N.Y. 2010) ...........................................................2, 16

*Radecki v. Glaxosmithkline*,
    646 F.Supp.2d 310 (S.D.N.Y. 2009), *aff'd,* 375 Fed. Appx. 46 (2d Cir. 2010) ...........19

*Rybner v. Cannon Design, Inc.*,
    No. 95 Civ. 0279 (SS), 1996 WL 470668 (S.D.N.Y. Aug. 20, 1996)..........23

*Shcherbakovskiy v. Da Capo Al Fine, Ltd.*,
    490 F.3d 130 (2d Cir. 2007) ..........................................................................18

*Shangold v. Walt Disney Co.*,
No. 03 Civ. 9522 (WHP), 2006 WL 71672 (S.D.N.Y. Jan. 12, 2006),
*aff'd*, 275 Fed. Appx. 72 (2d Cir. 2008) ..................................................................................2, 17

*United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*,
948 F.2d 1338 (2d Cir. 1991) ................................................................................................15, 16

*West v. Goodyear Tire & Rubber Co.*,
167 F.3d 776 (2d Cir. 1999) ........................................................................................................15

Plaintiff Violet Fryer ("Plaintiff" or "Ms. Fryer") and her attorneys Thompson Wigdor & Gilly LLP ("TWG") respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss.  As demonstrated below, neither Ms. Fryer nor her attorneys have engaged in improper conduct, let alone any misconduct that would justify the severe, and wholly unwarranted, sanctions of dismissal and/or monetary sanctions sought by Defendants.

## PRELIMINARY STATEMENT

The accusation that Plaintiff and her attorneys misled Defendants to obtain an inflated settlement is untrue.  Attempting to circumvent this fact and support their request for the drastic, wholly unwarranted sanctions requested in their motion, Defendants engage in a patently overreaching mischaracterization of the facts, while at the same time ignoring those facts which do not support their theory.  Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint and for Sanctions (cited herein as "Def. Mem.") is replete with mischaracterizations, exaggerations and outright falsehoods regarding the alleged conduct of Plaintiff and her attorneys, all of which is calculated to avoid having to answer Ms. Fryer's claims on the merits.  The following examples reveal the lengths to which Defendants have overreached in their "nothing to lose" shot at dismissing this action short of a trial:

- **Defendants' counsel portrays his questioning on Day One of Plaintiff's deposition as though he had *completed* her deposition, when he actually planned to end early and continue her deposition on a later date.**  Due to a preexisting childcare obligation that required him to end Plaintiff's deposition with over two hours of questioning left to complete (*see* Fryer Dep. I at 305:10-306:14),[1] Defendants' counsel curtailed his questioning of Ms. Fryer by his own choosing and certainly did not question her fully on the subject of mitigation of damages.  Thus, in pursuing sanctions, Defendants do not have equal standing

---

[1]     As cited herein, "Fryer Dep. I" refers to the transcript of Ms. Fryer's first day of deposition, which occurred on October 7, 2010 ("Day One").  A complete copy of Fryer Dep. I is attached as Exhibit H to the Declaration of Gregory N. Filosa (hereinafter cited as "Filosa Decl.").  Similarly, "Fryer Dep. II" refers to the transcript of Ms. Fryer's second day of deposition, which occurred on March 10, 2011 ("Day Two").  A complete copy of Fryer Dep. II is attached as Exhibit I to the Filosa Decl.

to a party that completed the deposition and questioned the deponent fully on all subjects at issue in the case.

- **Defendants' counsel similarly seeks to mislead the Court into believing that re-deposing Plaintiff on Day Two was necessitated by her testimony, as opposed to his preexisting personal obligations, in the hopes of unjustly imposing on Ms. Fryer the costs of that deposition.** Defendants' false characterization of the expense of continuing Plaintiff's deposition as "unnecessary" and somehow caused by her conduct is belied by the fact their lawyer always planned to continue his questioning of Ms. Fryer on a second day of deposition. Well before he perceived any opportunity to claim he had been misled by Ms. Fryer, Mr. Cohen stated on the record: "Counsel and I already discussed this off the record. I will state that we have about two hours left of time. . . . When I say "two hours," I mean two hours more of questions that I think we have to ask. We intend to continue this deposition." (Fryer Dep. I at 305:10-16). Re-casting Day Two as necessitated by *Plaintiff*, as opposed to Mr. Cohen's own personal choosing, in his zeal to pursue monetary sanctions is indicative of the utter disregard for the truth that pervades Defendants' entire motion.

- **Defendants incorrectly assert that Plaintiff "falsely testif[ied] that she had not gotten a new job since leaving OMD."** Despite making it throughout their brief (*see* Def. Mem. at 1, 14, 20), that statement is plainly not true. Defendants did not ask Ms. Fryer if she had gotten a job since leaving OMD or any number of other questions that would have elicited the information that they are quick to claim was "willfully and intentionally" concealed by Ms. Fryer. Once again, by abbreviating Day One of the deposition and, in turn, their questioning of Plaintiff, Defendants lack any standing to level charges of *perjury* and *professional misconduct* against Plaintiff and her attorneys.

- **The claim that TWG and Ms. Fryer engaged in a scheme of deception to extract an "exorbitant" or "inflated" settlement is not born out by the actual settlement negotiations that took place.** While the hyperbole and *ad hominem* attacks throughout Defendants' motion may make for colorful reading, they cannot distract attention from the absence of factual support for their theory. Plaintiff's settlement demand remained consistent before *and* after the filing of this action, before *and* after service of the economic expert report, before *and* after Plaintiff's deposition. Far from engaging in tactics to extract an "exorbitant" and "inflated" settlement as Defendants claim (because they must claim this to ensure their shot at sanctions), the bottom-line demand communicated early on to Defendants' counsel was always limited to Ms. Fryer's economic damages to date. And, as set forth below, Ms. Fryer lowered her demand substantially more in an effort to resolve this matter prior to Defendants' pursuit of this motion.

- **Defendants' characterizations of TWG's refusal to admit to these false accusations (because they are in fact untrue) as "aggressive" and showing "no remorse" is an unfair distortion.** Conveniently ignoring the extremely aggressive and overreaching character of the unsupported accusations they are making, Defendants attempt to fault Plaintiff and her counsel for merely defending themselves against these attacks is a particularly hollow argument for imposing sanctions. Moreover, this argument is refuted by Plaintiff's settlement posture in response to the allegations and acknowledgement of responsibility where it fairly lies with Ms. Fryer and her attorneys.

Despite their mischaracterizations of the facts, Defendants cannot satisfy the high legal standards for proving an entitlement to the sanctions requested in their motion.  While Defendants are quick to proclaim "fraud upon the court," they have failed to present in their motion any *evidence*, as opposed to page after page of accusation, that Plaintiff and TWG engaged in a "willful and bad-faith scheme" to thwart the judicial discovery process.  There is no evidence -- let alone the clear and convincing evidence that Defendants' claim -- establishing that Plaintiff "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter," as is required to obtain the sanctions sought by Defendants.  *See Passlogix, Inc. v. 2FA Technology, LLC*, 708 F. Supp. 2d. 378, 393-94 (S.D.N.Y. 2010).  To the contrary, it is clear that the conduct of which Ms. Fryer is accused is markedly distinct from the cases in which dismissal and/or monetary sanctions were imposed.  *See*, *e.g.*, *Shangold v. Walt Disney Co.*, No. 03 Civ. 9522 (WHP), 2006 WL 71672 (S.D.N.Y. Jan. 12, 2006) (dismissing action because clear and convincing evidence showed that plaintiffs fabricated evidence and continually lied about this fabrication despite overwhelming evidence to contrary), *aff'd*, 275 Fed. Appx. 72 (2d Cir. 2008).  It is apparent from Defendants' motion that -- even accepting the gross distortion of the facts that Defendants' motion advances -- Ms. Fryer's alleged conduct does not, because it cannot, meet this standard.  The Court should reject Defendants' motion for what it is -- namely, an opportunistic gamble to escape having to answer Ms. Fryer's causes of action on their merits and, in their lawyer's own words, "let the chips fall where they may."

## STATEMENT OF FACTS

On November 16, 2009, Plaintiff filed the Complaint against Defendants asserting claims of: (i) unlawful interference with her exercise of rights protected by the Family Medical Leave Act ("FMLA"), (ii) retaliation for exercising rights protected by the FMLA, and (iii) pregnancy discrimination in violation of the New York State and New York City Human Rights Laws.  (*See*

3

Complaint, Docket No. 1).[2]  Ms. Fryer was employed by Defendants from 1997 through June 10, 2009, at which point she was terminated as part of a reduction in force which occurred slightly more than three months after she returned from an FMLA-designated maternity leave.  (*See* Second Amended Complaint (hereinafter "Compl. ¶ __") ¶¶ 8, 46-61, Docket No. 20).  Prior to her maternity leave, and within weeks of notifying Defendants of her pregnancy, under the guise of a "restructuring" which drastically limited her role within Defendants' research department, Ms. Fryer was stripped of many of her key job responsibilities as well as her only direct report.  (*See* Compl. ¶¶ 31-45).  When she returned from maternity leave, she was ostracized, further marginalized within the department and, not surprisingly, selected for termination as part of a reduction in force effective June 10, 2009.  (*Id.* ¶¶ 46-58).  On the date of her termination, Ms. Fryer was told by a co-worker with knowledge of the decision to eliminate her position, "don't take this the wrong way, but being out on maternity leave didn't help your case."  (*Id.* ¶ 57).

**Pre- and Post-Complaint Settlement Discussions**

Before filing her Complaint, Plaintiff's attorneys engaged in settlement discussions with OMD's in-house attorney and made an initial settlement demand of $350,000.  (*See* Filosa Decl. ¶ 4).  OMD countered with an offer of 26 weeks of salary (approximately $53,500), representing an increase of 4 weeks above the 22 weeks of salary continuation that OMD had initially offered Ms. Fryer under the Settlement Agreement and General Release provided to her on the date of her termination.  (*Id.* at ¶ 5).  Ms. Fryer lowered her settlement demand to $250,000.  (*Id.* at ¶ 6).  When OMD refused to increase its offer beyond an additional 4 weeks of salary continuation (to 30 weeks

---

[2]      The initial Complaint also named Omnicom Group Inc. as a defendant.  After Defendants raised concerns that Omnicom Group Inc. was not a proper party, Plaintiff amended the Complaint on January 12, 2010, removing Omnicom Group Inc. as a defendant and adding Omnicom Media Group as a named defendant.  (*See* Amended Complaint, Docket No. 6).  On May 25, 2010, having received notice of her right to sue from the Equal Employment Opportunity Commission, Plaintiff, with leave of the Court, filed the Second Amended Complaint, which added a claim of pregnancy discrimination in violation of the Title VII of the Civil Rights Act of 1964 ("Title VII").

total, or approximately $62,000), Ms. Fryer commenced this action.  (*Id.* at ¶ 7).  The parties did not discuss settlement again until March 1, 2010, when in connection with the parties' Rule 26(f) conference, TWG reiterated Plaintiff's opening settlement demand of $350,000.  (*Id.* at ¶ 9).  Defendants, now represented by their current outside counsel, did not respond to Plaintiff's settlement proposal.  (*Id.*).

## Ms. Fryer's Initial Production of Job Search Documents

On June 2, 2010, Ms. Fryer produced documents responsive to Defendants' first document requests, which included, *inter alia*, copies of all documents concerning her efforts to obtain employment following the termination of her employment with OMD in June 2009.  (*See* Filosa Decl. ¶ 10).  On August 3, 2010, Defendants' counsel raised certain concerns regarding Plaintiff's production of documents concerning her job search efforts *while she was still employed by OMD*. (*Id.* at ¶ 11; Filosa Decl. Ex. A).  Similarly, on August 12, 2010, Defendants' counsel raised, via e-mail, additional concerns regarding Ms. Fryer's communications with a former co-worker.  (*See* Filosa Decl. Ex. B).  Ms. Fryer responded to those issues raised by Defendants by letter dated September 7, 2010.  (*Id.* at Ex. C).  Included with this response were four pages of documents which were specifically responsive to Defendants' request that Plaintiff conduct an additional search for documents concerning this e-mail communication with a former co-worker.  (*Id.* at 2).  Similarly, following service of the economic damages report, Defendants requested that Ms. Fryer produce those documents relied upon and referenced by Plaintiff's economic damages expert in their report. (*See* Filosa Decl. ¶ 14).  Ms. Fryer produced these documents (which included copies of Ms. Fryer's responses to the expert's standard questionnaire as well as her prior years' tax returns) to Defendants on October 5, 2010 and October 12, 2010 respectively.  (*Id.*).  At no point prior to October 27, 2010 did Defendants request that Ms. Fryer supplement her production of documents concerning her ongoing job search effort.  (*Id.* at ¶ 15).

5

**Ms. Fryer's Job Offer From UM**

On September 10, 2010, prior to being offered and accepting a position with Kraft Foods ("Kraft"), Ms. Fryer was offered a position with UM as a Research Director -- a position similar to one that she held with OMD, except that it would have been focused on one client's needs rather than numerous clients. (*See* Fryer Dep. II at 46:23-47:17). While excited about this position with UM, she felt that the position with Kraft was more in line with her long-term career goals. (*Id.* at 47:18-48:20). After initially accepting the position with UM, she later rescinded her acceptance when she was offered the position with Kraft. (*Id.* at 96:19-98:9; 111:10-112:1).

**Ms. Fryer's Employment With Kraft Foods**

On October 11, 2010, Ms. Fryer began her employment with Kraft as Associate Director, Media Services at a salary of $130,000 a year (not including bonus compensation). (*See* Fryer Dep. II at 7:14-23; 8:21-9:6; 9:24-10:7). On September 2, 2010, she interviewed with Mark Stewart -- the ultimate decision-maker who was to become her supervisor -- and, while Mr. Stewart told her that she was a "shoe-in" for the job, he did not offer her the position at that time. (*Id.* at 24:18-28:18; 55:18-56:8). On September 14, 2010, Ms. Fryer met with Eve Snyder, one of the brand managers with whom she would work -- but not report to -- if she was hired for the position. (*Id.* at 56:17-57:12). Ms. Fryer's meeting with Ms. Snyder "was more of a casual information gathering type of meeting" for Ms. Fryer "to learn about [Ms. Snyder's] role and what her function is" and "[h]ow her department works with marketing services," rather than a formal interview. (*Id.* at 60:16-20; 69:2-13). During this meeting, Ms. Fryer and Ms. Snyder discussed (i) the type of work that Ms. Snyder's department performed, (ii) how Mr. Stewart's (and ultimately Ms. Fryer's) team in media services could work with Ms. Snyder to achieve these goals, and (iii) Ms. Fryer's background on the agency side. (*Id.* at 70:8-71:14). Additionally, while Ms. Snyder may have been provided with a

6

copy of Ms. Fryer's resume, she did not appear to have it during their meeting.[3]  (*Id.* at 78:23-79:6).

Consistent with this, Ms. Fryer did not follow up her meeting with Ms. Snyder by sending a thank

you note as she had done following all of her previous interviews.  (*Id.* at 60:5-25).

On September 17, 2010, Kraft formally offered -- and Ms. Fryer accepted -- the position with

Kraft's Media Services Department.  (*See* Fryer Dep. II at 88:4-22).  While Ms. Fryer told Kraft that

she was ready to start right away, Kraft did not schedule her to formally start until October 11, 2010

-- four days after the previously scheduled first day of her deposition.  (*Id.* at 95:16-96:11).

**Plaintiff's September 22, 2010 Economic Damages Report**

On July 16, 2010, Ms. Fryer notified the Court that she had retained Frank Tinari, Ph.D. of

Tinari Economics Group to calculate the projected economic damages that she would have suffered

as a result of Defendants' unlawful actions.  (*See* Filosa Decl. ¶ 16).  Pursuant to the Court's July 19,

2010 Revised Scheduling Order, Plaintiff's expert report was due on September 7, 2010, but at the

request of Plaintiff, this deadline was extended to September 27, 2010.  (*Id.* ¶ 17).  Concerned about

seeking a second extension of the expert report deadline, Mr. Filosa elected to serve the expert report

notwithstanding Ms. Fryer's acceptance of a job offer with Kraft and undertook to obtain a revised

report once she commenced work and received income from Kraft.  (*Id.* ¶ 18).  On September 27,

2010, Mr. Filosa served Defendants with a copy of Dr. Tinari's expert report.  (*See* Filosa Decl. Ex.

D).  Dr. Tinari's expert report estimated the total present value of Ms. Fryer's economic loss since

the termination of her employment to be between $354,952 and $1,073,071.  (*Id.* at 2).  Dr. Tinari's

revised report estimated the total present value of Ms. Fryer's economic loss to be $151,239.  (*See*

Filosa Decl. Ex. O).

---

[3]     As discussed more fully below, in furtherance of their efforts to mischaracterize the facts, Defendants assert that Ms. Snyder had a copy of Ms. Fryer's resume and Ms. Fryer and Ms. Snyder "discussed, among other things, Fryer's work history and job qualifications," while citing to a portion of Ms. Fryer's deposition testimony which does not support this conclusion.  (*See* Def. Mem. at 13 (misciting Fryer Dep. II at 70:6-79:6 for proposition that they discussed "[Ms.] Fryer's work history and job qualifications")).

## Ms. Fryer's October 7, 2010 Deposition

On September 7, 2010, Defendants' counsel inquired as to Ms. Fryer's availability for a deposition to be held on either October 6 or October 7, 2010.  (*See* Filosa Decl. Ex. E).  Less than a week later, Mr. Filosa confirmed that Ms. Fryer was available on October 7, 2010.[4]  (*See* Filosa Decl. Ex. F).  Pursuant to notice stating that Plaintiff's deposition would "continue from day to day until completed," (Filosa Decl. Ex. G), Defendants' counsel deposed Ms. Fryer on October 7, 2010 for nearly five hours before ending early.  Defendants' counsel stated that he had "about two more hours of questions that I think we have to ask," but that he had childcare obligations which required him to leave and that Defendants "intend[ed] to continue this deposition." (*See* Fryer Dep. I at 305:10-306:14).  Further indicating that Plaintiff's deposition was not yet complete, Defendants neither provided an errata sheet for the first day of her deposition, nor requested that Ms. Fryer review the transcript of Day One to complete an errata sheet and/or sign her partial deposition.  (*See* Filosa Decl. ¶ 24).  During the course of Day One of her deposition, Ms. Fryer openly identified documents concerning her job interviews that she had within the past 60 days that had not been produced or provided to her attorneys.  (*See* Fryer Dep. I at 255:18-256:12).

During Day One of her deposition, Ms. Fryer was asked questions which touched on her efforts to find subsequent employment, but she was not asked whether she had received or accepted an offer of employment with any employer.  (*See* Fryer Dep. I at 249:11-257:2).  Instead, Ms. Fryer was asked whether she had worked since being terminated by OMD:

> Q:     Have you worked since you left OMD?
> A:     No.

---

[4]     While Defendants have insinuated that Ms. Fryer intentionally scheduled her deposition to occur prior to her start date (*see* Fryer Dep. II at 11:23-12:20), the fact that Ms. Fryer's deposition was scheduled at least a week before she was even offered the position with Kraft, as well as before Kraft unilaterally set her start date for October 11 in spite of her expressed willingness to begin right away, demonstrates that Defendants' insinuations are false.  (*Id.* at 95:9-96:11).

(*Id.* at 249:11-12).  She was also asked which prospective employers she had interviewed with and whether she had second interviews with any of these companies.  (*Id.* at 255:12-257:2).

Specifically, Ms. Fryer was asked:

> Q: So these are companies that you had interviews with?
> A: Yes.
> Q: And have you had second interviews with any companies?
> A: With a few of them.  And after I -- I didn't -- either I didn't hear back or I didn't get the job.

(*Id.* at 256:13-20). Despite believing that there was no chance she would leave Day One without revealing her job with Kraft (*see* Fryer Dep. II at 179:19-21 ("I never ever in a million years thought I would walk out of here that day without you knowing that I had a job. . .")), she did not testify that she had been offered and accepted a position with Kraft because she was never asked a question calling for this answer:

> I tried to keep focusing on the answer to the question . . . but I got confused sometimes as to when I should just answer the question, be quiet and let [Defendants' counsel] ask the question or should I start to like I am now explaining myself a little bit more.  So I get torn between which is the best way to do things sometimes. . . .  I thought that there would be more questioning to come without me having to volunteer that information. . . . I expected to be spending a lot more time with [Defendant's counsel] on follow up questions in regards to that topic.

(*Id.* at 175:18-19; 175:25-176:4; 176:18-24).

Because Ms. Fryer did not consider her meeting with Eve Snyder to be a "second interview," she did not believe that Kraft was responsive to Mr. Cohen's question regarding second interviews. (*See id.* at 175:10-176:6).[5]

---

[5]      As is evident from Day Two of Ms. Fryer's deposition, Defendants' counsel repeatedly tried to mischaracterize her deposition testimony.  For example, when questioning Ms. Fryer about her prior testimony regarding whom she had spoken to in the 60 days prior to her deposition, Ms. Fryer clearly limited her answer to those headhunters with whom she had communicated, yet Mr. Cohen misleadingly attempted to characterize her testimony as her engaging in a feigned inability to recall Kraft, despite Ms. Fryer's clear reference to headhunters in her next answer.  (*See* Fryer Dep. II at 161:13-165:20).

With respect to her multiple interviews with UM after which she received a job offer, Ms.

Fryer explained that she did not identify UM because:

> A:   [W]hen I said I didn't hear back or I didn't get the job, I meant I didn't end up with the job in terms of getting an offer and accepting it and having a job.
>
> Q:   So where you said "I didn't get the job," you were in fact offered the job; correct, you already testified to that?
>
> A:   That's right, yes.
>
> Q:   So when you said I didn't get the job, what you meant was you didn't accept the job?
>
>               *      *      *      *
>
> A:   I didn't end up with the job is what I am trying to say is what I was trying to convey that day.
>
> Q:   But the words you stated were: "Either I didn't hear back or I didn't get the job." Those were the words; correct?
>
> A:   Those were the words I used that day off the cuff, but I think like I said if I were to elaborate a little bit more I think you would have understood what I meant really was that I didn't end up with the job and I would have gone into the exact details to any degree as to why.

(Fryer Dep. II at 177:11-178:19) (attorney objections omitted).  At the time Defendants' counsel

ended Day One with two more hours of questioning to complete, Ms. Fryer had not testified about

her accepted job offer from Kraft.

**<u>Settlement Discussions Immediately Following Day One of Plaintiff's Deposition</u>**

On October 12, 2010, Defendants' counsel contacted Mr. Filosa to discuss settlement,

offering to settle Ms. Fryer's lawsuit for $60,000 -- approximately the same amount that OMD had

offered Ms. Fryer in August 2009 prior to the filing of the Complaint.  (*See* Filosa Decl. ¶ 25).  In

response, Ms. Fryer lowered her demand to $250,000 -- which was slightly less than the wages that

Ms. Fryer had lost since her termination, plus attorneys' fees and costs which she incurred in

pursuing this litigation -- which Mr. Filosa represented to be Ms. Fryer's bottom line number for

resolving this dispute.  (*Id.* at ¶ 26).  Shortly thereafter, Defendants raised their demand to $90,000

and then again to $125,000, both of which were rejected by Plaintiff because they were too far

below her bottom line "make whole" number, although Mr. Filosa suggested the possibility of

settling below, but very close to this amount.  (*Id.* at ¶ 27).  Following rejection of Defendants' offer

of $125,000, on October 20, 2010, Defendants' counsel raised the prospect of mediation, which Plaintiff and Mr. Filosa did not believe would be cost-effective given the experience of the parties in negotiating settlements of these cases and the relatively narrow gap in their positions.  (*Id.* at ¶ 28).

On October 27, 2010, Defendants' counsel contacted Mr. Filosa because Defendants had learned that Ms. Fryer began working at Kraft and asked for production of all documents relating to her employment with Kraft.[6]  (*See* Filosa Decl. Ex. J).  Prior to Defendants' request, Ms. Fryer had already begun collecting these documents but had not yet provided them to her attorneys so they could be produced to Defendants.  (*See* Filosa Decl. ¶ 29; Fryer Dep. II at 132:4-9).  Accordingly, Mr. Filosa advised Defendants' counsel that Ms. Fryer was already in the process of collecting these documents and would supplement her production, as well as revise her expert report which likewise was already in process.  (*See* Filosa Decl. Ex. J).  Mr. Filosa also confirmed in a subsequent phone conversation the position that Ms. Fryer had employment with Kraft and the salary associated with this position.  (*See* Filosa Decl. ¶ 30).

**Plaintiff's Supplemental Production of Documents Concerning Her Job Search Efforts**

On November 11, 2010, Ms. Fryer completed her review and production of documents pertaining to her job search efforts.  (*See* Filosa Decl. ¶ 32).  On November 16, 2010, she produced additional documents pertaining to the salary and benefits that she had been receiving since beginning her employment with Kraft one month prior.  (*Id.* at ¶ 33).  On November 19, 2010, Defendants requested that Plaintiff produce seven categories of documents concerning her employment with Kraft and her efforts to obtain employment with UM by December 10, 2010.  (*See* Filosa Decl. Ex. M).  In response, on December 13, 2010 Ms. Fryer produced an additional 84 pages

---

[6]     When he contacted Mr. Filosa on October 27 regarding Ms. Fryer's employment with Kraft, Mr. Cohen inquired as to whether Plaintiff would revise her settlement demand in light of her subsequent employment.  (*See* Filosa Decl. ¶ 30).  The following day, Mr. Filosa advised that Ms. Fryer would not reduce her settlement demand because, as previously indicated, this was her bottom line "make whole" settlement amount.  (*Id.* at ¶ 31).

of documents, as well as supplemented her response to one of Defendants' previously served interrogatories.  (*See* Filosa Decl. Ex. N).  On December 3, 2010, Ms. Fryer served Defendants with the revised expert report prepared by Tinari Economics Group.  (*See* Filosa Decl. Ex. 36).

**Defendants' Threatened Sanctions and Settlement Posture**

On December 22, 2010, Defendants requested a pre-motion conference to seek permission to file the instant motion.  At the January 14, 2011 conference, the Court set a briefing schedule, but also recommended that the parties discuss resolving this case to avoid any need for Defendants to proceed with their motion.  (*See* Declaration of Scott B. Gilly ("Gilly Decl.") ¶ 3).  Defendants responded to the Court's recommendation by proposing that Plaintiff dismiss the lawsuit with prejudice and the parties execute general releases in exchange for Defendants not seeking sanctions against Plaintiff or TWG on a take-it-or-leave-it basis with 24 hours to respond.  (*See* Gilly Decl. Ex. A).  Mr. Gilly expressed the unreasonableness of Defendants' settlement posture:

> I do not believe this comports with what Judge Pauley instructed both parties to do in terms of exploring settlement of the case.  Greg is on trial, and I'm in mediation tomorrow, so we will not even have a chance to present and discuss this purported "settlement offer" before your unilaterally imposed 24-hour deadline to accept it.  Regardless, while I do need to go through the process of presenting and discussing it with Ms. Fryer before communicating what I am sure will be her rejection of your proposal, I would like to meet with you to have a more serious discussion about settlement than your letter allows.
>
> Based upon your letter, it is clear to me that you are overplaying your hand here.  I heard the Judge loud and clear, make no mistake, but I encourage you (and your client) not to assume a false sense of over-confidence from the fact we are operating necessarily under the constraint of the attorney-client privilege and cannot make representations that you have requested without violating such privilege.  You unfairly have sought to take advantage of that limitation to paint a false picture of our firm's actions.  I meant what I said to Judge Pauley, I would be perfectly content to allow him to make an in camera review of the complete record of information, communications, etc. because I am certain that it will vindicate our firm against the accusations you have leveled by stitching together half-truths and implications from our firm's adherence to our ethical obligations to protect confidential attorney-client communications and advocate zealously on behalf of our client.
>
> Continued posturing along the lines of your letter, however, is going to be a waste of time and is not something that I think Judge Pauley had in mind when instructing the

parties as he did at the conference.  Your estimate of the expenses of moving forward with your motion is exactly the amount I estimated when thinking about this over the weekend.  It would not be wise to spend $50,000 on a motion that will end up leaving you right where you started as I do not believe you will be successful obtaining dismissal of this action.  Rather than debate this in continued written communications that likely will get us nowhere, I encourage you to consider meeting so that we can discuss the possibility of settling this matter in a realistic fashion.

I have good availability on Friday.  Please let me know if you have an interest in meeting and, if so, when you are available.

(*Id.* at Ex. B).  Defendants' counsel agreed to meet as requested, but emphasized, "OMD is 100% prepared to move for sanctions and let the chips fall where they may . . .   And even if the case is not dismissed -- which is of course, a possibility -- there is little doubt that Ms. Fryer will be hit with a damning opinion and substantial monetary sanctions that may be difficult for her to pay."  (Gilly Decl. Ex. C).  Counsel met on January, 21, 2011, where Ms. Fryer offered to resolve this dispute for $135,000 -- or an amount below her back pay following the termination of her employment with OMD.  (*Id.* at ¶ 7).  Defendants responded with $10,000 -- which they represented was their best and final offer.  Defendants' counsel explained that OMD felt it had nothing to lose by proceeding with the instant motion and taking its shot at dismissal or some other sanction.  (*Id.*).  On January 24, 2011, after consulting with Plaintiff, Mr. Gilly advised Defendants that she would not accept Defendants' "best and final" offer.  (*See* Gilly Decl. Ex. D).

**The Continuation of Ms. Fryer's Deposition**

On March 11, 2011, Ms. Fryer's deposition was continued on a date mutually agreed to by the parties.  (*See* Gilly Decl. ¶ 9).  Ms. Fryer cooperated with Defendants on the scheduling of such deposition, although the deposition was rescheduled a number of times due to the scheduling of a federal court trial in another matter being handled by Plaintiff's counsel.  (*Id.*).  Additionally, in connection with the continuation of Ms. Fryer's deposition, Defendants' counsel requested disclosure of the dates upon which Ms. Fryer notified TWG that she (i) received a job offer from UM, (ii) received a job offer from Kraft, and (iii) accepted the job offer from Kraft.  (*See* Gilly Decl.

Ex. E).  Prior to making such disclosure, TWG was careful to review the implications on the

attorney-client privilege and took time to research these issues, secure Defendants' agreement not to

claim any waiver of the privilege, and then counsel Ms. Fryer on these issues so that she could make

an informed decision authorizing the such disclosure.  (*See* Gilly Decl. ¶ 11).  Contrary to

Defendants' claims of delay, Plaintiff's counsel disclosed this information in relation to the second

day of Ms. Fryer's deposition, which was the purpose for which this information was requested.[7]

**TWG's Discovery Practices**

In reviewing this matter, it is apparent that TWG did not supplement Plaintiff's document

production as vigorously and timely as it should have, not supplementing her production within 40

days of Ms. Fryer's job offer at Kraft even though TWG had instructed Plaintiff to gather the

materials for production as soon as possible.  TWG should have ensured that Ms. Fryer supplied her

attorneys with complete job search records, among other documents responsive to discovery, and

produced them to Defendants in advance of Day One of Plaintiff's deposition.  This failing, while

inadvertent and resulting from partner oversight that was less rigorous than it should have been, was

a failing nonetheless.  It was also compounded by the mistake of serving an expert report, which had

little utility in light of Ms. Fryer's acceptance of the Kraft position 10 days earlier, in the belief it

was better to produce a revised report at a later date so that Plaintiff complied with the Court-

ordered expert report deadline, rather than seeking an extension of that deadline for good cause.

(*See* Gilly Decl. ¶¶ 15-17).

---

[7]     Defendants mischaracterize the timing of this disclosure as "TWG delay[ing] responding for
more than a month" to create the false appearance of an intent to conceal such information. (Def.
Mem. at 12-13).  While they criticize TWG for taking the time to research whether Defendants'
request could result in a waiver of the attorney-client privilege, as well as discuss these issues with
Ms. Fryer, Defendants' counsel was well aware that the timing of TWG's disclosure of this
information was linked to the scheduling of the continuation of Ms. Fryer's deposition.  As the
unredacted communications between counsel reveal, the parties were in the process of scheduling
the second day of Ms. Fryer's deposition for a date upon which all parties were available and Ms.
Fryer's disclosure of this information was linked to that deposition date alone, not any "delay" as
Defendants cynically claim.   (*See* Gilly Decl. Ex. ¶ E).

The foregoing is something TWG takes very seriously not only because it is the right thing in compliance with our obligations as lawyers and officers of the Court, but also because of the excellent reputation for integrity and high quality legal practice that TWG has worked very hard to build over its first eight years of existence.  Consequently, TWG responded to Defendants' accusations -- and the concerns expressed by the Court -- by tightening controls to ensure clients' obligations to supplement discovery are fully satisfied on a timely and more regular basis.  While the discovery practices in this case were not free of mistake, they do not call for sanctions against TWG or Ms. Fryer.  (*Id.* at ¶¶ 18-20).

## ARGUMENT

### I.   LEGAL STANDARD FOR DISMISSAL AND/OR SANCTIONS

It is undisputed that this Court possesses the inherent power to sanction parties and attorneys for improper conduct; however, it is equally clear that this power should be exercised with "restraint and discretion."  *See United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991) ("because of the 'very potency' of a court's inherent power, it should be exercised 'with restraint and discretion.'") (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)).  Thus, claims for sanctions are "to be awarded cautiously" with all doubts and inferences "resolved in favor of the party against whom sanctions are sought." *Mackler Productions, Inc. v. Turtle Bay Apparel Corp.*, No. 92 Civ. 5745 (RPP), 1997 WL 269505, at *13 (S.D.N.Y. May 21, 1997) (internal citations omitted).  Similarly, "dismissal with prejudice is a harsh remedy to be used only in extreme situations."  *Bobal v. Rensselaer Polytechnic Inst.*, 916 F.2d 759, 764 (2d Cir. 1990) (reversing dismissal as sanction for violation of discovery order); *see also West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) ("because dismissal is a drastic remedy, it should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions").

In arguing for the drastic remedy of dismissal here, Defendants go so far as to accuse Plaintiff and her attorneys of having committed a "fraud against our judicial institutions themselves." (*See* Def. Mem. at 22).  To establish that a party has engaged in fraud upon the court, it must be demonstrated "clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier of fact or unfairly hampering the presentation of the opposing party's claim or defense.'" *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002) (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 2002)).  As such, "[a] fraud on the court occurs where a party: (1) improperly influences the trier [of fact], (2) unfairly hampers the presentation of the opposing party's claim or defense, (3) lies to the court and his adversary intentionally, repeatedly and about issues that are central to the truth-finding process, or (4) knowingly submits fraudulent documents to the Court." *Passlogix*, 708 F. Supp. 2d at 395 (internal quotations and citations omitted).  None of that, nor any conduct remotely approaching such offenses, occurred here.

With respect to the monetary sanctions sought, this Court clearly has the inherent power to "assess attorneys' fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons;" however, this too is a power that "courts must take pains to exercise [with] restraint and discretion." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998) (citing *Chambers*, 501 U.S. at 43).  Accordingly, before exercising such power, the Second Circuit has required a finding of bad faith shown by (i) clear evidence or (ii) harassment or delay or other improper purposes." *Id.* (citing *Int'l Bhd. of Teamsters*, 948 F.2d at 1345).  With these standards in mind, for the reasons discussed more fully below, Defendants cannot establish that they are entitled to sanctions -- whether it be dismissal of Plaintiff's lawsuit or monetary sanctions.

## II.   DEFENDANTS' REQUEST FOR SANCTIONS SHOULD BE DENIED

While Defendants are quick to level serious accusations against Plaintiff and her attorneys, accusing them of having attempted to commit a "fraud upon the court," as well as a "willful and bad-faith effort to thwart the other party's discovery efforts" and "subvert the judicial process" is truly overreaching beyond the pale.  (*See* Def. Mem. at 16-17).  This motion stems from a single statement (which was not even responsive to the question asked) made during a deposition in which it was clear that the examining attorney curtailed his questioning to end early with more than two hours of questioning remaining to be completed for a preexisting childcare obligation he had that day.  (*See* Fryer Dep. I at 305:10-306:14).  Indeed, it is clear from both the cases cited above, as well as those relied upon by Defendants, that the egregious circumstances warranting sanctions are not present here.

For instance, Defendants rely heavily on *Shangold v. Walt Disney Co.*, No. 03 Civ. 9522 (WHP), 2006 WL 71672 (S.D.N.Y. Jan. 12, 2006), a prior decision of this Court in which there was no dispute that the plaintiffs fabricated evidence and continually lied about their fabrication in the face of overwhelming evidence to the contrary.  2006 WL 71672 at *3-5.  Those facts are not present here.  The instant matter is also vastly different from those cases where there was actual perjury or the suborning of perjury.  *See, e.g., Mackler Prods., Inc.*, No. 92 Civ. 5745 (RPP), 1997 WL 269505, *13-14 (S.D.N.Y. May 21, 1997) (dismissing action because plaintiff both testified falsely and instructed witness to testify falsely at trial).  Similarly, Defendants' reliance on *McMunn* is misplaced.  In *McMunn*, the plaintiff engaged in a wide variety of misconduct, including testifying falsely on a number of occasions, suborning the perjury of her son, ignoring a court order to compel the production of documents, hiding the existence of a supporting witness, tampering with key pieces of evidence, and engaging in the sham sale of her apartment in order to support her damages claim.  *Id.* at 446-60.  Further, the plaintiff in *McMunn* continued to lie about facts material to her

claims, even when confronted with indisputable video evidence to the contrary. *Id.* In light of this conduct, the court found plaintiff's conduct to be sanctionable because she "eschews corrective measures even when confronted with irrefutable evidence of her lies." *Id.* at 460. Despite Defendants' transparent attempts to re-shape the actions of Ms. Fryer and her attorneys to fit within *McMunn*, these actions (even as mischaracterized and overstated by Defendants) are far short of the sanctionable conduct in *McMunn* and other cases.

Indeed, because the facts of the instant matter are so vastly different from those in the cases relied upon by Defendants, it is not surprising that their brief carefully avoids elaborating on the distinct circumstances in any one of those cited cases. *See, e.g.*, *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134-35 (2d Cir. 1998) (approving sanctions after defendant produced, well after close of discovery, highly relevant documents withheld throughout entirety of litigation); *DAG Jewish Directories, Inc. v. Y & R Media, LLC*, No. 09 Civ. 7802 (RJH), 2010 WL 3219292, at *4-5 (S.D.N.Y. Aug. 12, 2010) (sanctioning with dismissal plaintiff who submitted forged evidence to court and continued to argue the document's legitimacy in contempt proceeding, despite overwhelming evidence of its forgery); *Miller v. Time-Warner Comm'n, Inc.*, No. 97 Civ. 7286 (JSM), 1999 WL 739528, at *2 (S.D.N.Y. Sept. 22, 1999) (dismissing action because plaintiff deliberately erased handwritten notes from documents to prevent their discovery, lied repeatedly about when and why she made such erasures, and repeated her perjury in hearing before the court).

### A.    Defendants Fail to Establish Any Entitlement to the Sanction of Dismissal

As previously noted, "[t]he sanction of dismissal 'is a drastic remedy that should be imposed only in extreme circumstances.'" *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 140 (2d Cir. 2007) (internal citations omitted). Such a sanction is "intended to remedy otherwise irremediable prejudice or to address persistent bad-faith pre-trial conduct by a litigant." *Friends of Animals, Inc. v. U.S. Surgical Corp.*, 131 F.3d 332, 334 (2d Cir.1997). While the standard for

dismissal is clear, noticeably absent from Defendants' brief is any evidence that the alleged misconduct has resulted in irremediable prejudice to Defendants. The sole "prejudice" Defendants identify is incurring (i) the cost of having to re-depose Ms. Fryer on a second day, which is completely false as revealed by the transcript of her first day when Defendants' counsel stated that he had planned to continue the deposition on a second day for his own personal reasons, and (ii) the cost of a rebuttal expert report which Defendants did not need after Plaintiff's revised report, however this is no different from Ms. Fryer herself having to pay more than $3,500 on an initial expert report that had no utility after her employment at Kraft. Furthermore, Defendants' do not (because they cannot) show that Ms. Fryer engaged in the type of persistent, bad-faith conduct that is present in those cases sanctioning a plaintiff with dismissal.

Instead, Defendants repeat the conclusory allegation that Plaintiff committed perjury during both days of her deposition. Yet, merely because Defendants repeatedly say it, does not make it so. As Defendants concede, perjury is "false testimony concerning a material matter with the *willful intent to provide false testimony*, rather than as a result of confusion, mistake or faulty memory." (*See* Def. Mem. at 18 (quoting *Radecki v. Glaxosmithkline*, 646 F.Supp.2d 310, 315 (D. Conn. 2009) (emphasis added), *aff'd,* 375 Fed. Appx. 46 (2d Cir. 2010)).[8] To find "willful intent," however, the witness must make the perjurious testimony "with the specific purpose of obstructing justice." *Radecki*, 375 Fed. Appx. at 47. Defendants cite the correct standard, yet fail to meet it.

Defendants' allegations of perjury center on the following question and answer from Day One of Ms. Fryer's deposition:

---

[8]      Unlike the present case, the plaintiff in *Radecki* made an affirmative statement that was demonstrably false at the time he made it. 646 F.Supp.2d at 315 ("Radecki gave false testimony when he stated 'I had-have stage III prostate cancer with a metastatic brain lesion…' At no time did Radecki have a metastatic brain lesion."). This is distinctly different from the disputed interpretation of the testimony of Ms. Fryer.

| Q: | And have you had any second interviews with any companies? |
|---|---|
| A: | With a few of them.  And after I -- I didn't -- either I didn't hear back or I didn't get the job. |

(Fryer Dep. I at 256:16-20).  While the first sentence of Ms. Fryer's answer is responsive to the question, the second sentence is not.  Even accepting that this added statement in her answer was mistaken as to the job offer she received from UM after many interviews, Ms. Fryer cannot legitimately be said to have perjured herself by providing a response to a question that was not even asked and then never followed up with further direct questioning on the subject of whether she had received any job offers after her termination from OMD.  Further, as Ms. Fryer explained at the continuation of her deposition with respect to why she did not contemplate UM when making this statement, when she said that she "didn't get the job," she meant that she did not "end up with the job."  (*See* Fryer Dep. II at 177:9-178:19).  Although Defendants remain displeased with this explanation, Ms. Fryer's response is not perjurious.  Thus, it is a gross overstatement for Defendants to claim that this testimony "was patently false and designed to mislead OMD about her job situation."  (*See* Def. Mem. at 7).[9]

Defendants' accusations that Ms. Fryer intentionally concealed the fact that she had accepted an offer of employment with Kraft are equally unsupported by the evidence.  As Ms. Fryer's clear, unmistakable and unrebutted testimony establishes, this allegation is simply not true:

| Q: | Were you concerned about the possibility of OMD finding out about your job offer from Kraft? |
|---|---|
| A: | Absolutely not.  There is no way to, to hide that and there is no reason to. |
| Q: | Is it fair to say that when you testified at your deposition on October 7, 2010 that you were hoping to avoid mentioning that you had received a job offer from Kraft? |
| A: | No. |

_____

[9]       During Day Two of her deposition, Ms. Fryer acknowledged that her testimony in this one instance could be taken differently than she intended, but she elaborated: "I didn't have the intention of misleading anybody or presenting it one way and meaning another.  I am not an experienced depositioner or whatever you call it.  I answered the questions under the circumstances I was here.  I was nervous.  I had a lot going on in my mind and a lot of things going on in my life and I just tried to, as best I could, collect myself and answer the questions."  (Fryer Dep. II at 182:9-18); *see also id.* at 113:10-114:23 (identifying stressful circumstances surrounding first day of her deposition)).

Q:     You are certain about that?
A:     I am positive.

(Fryer Dep. II at 133:8-19).

While Defendants later questioned whether Ms. Fryer was aware that Defendants' counsel

had not asked her a single question about her job offer with Kraft, Ms. Fryer's response is

particularly telling:

Q:     At any point in the day did it occur to you that OMD's attorneys had not asked you a
       single question about your Kraft job offer?
A:     It did occur to me that it was odd that that question wasn't asked.
Q:     And did it occur to you during the, your deposition that OMD had not asked you
       about your UM job offer?
A:     I would have answered those questions if I was given the opportunity to be asked
       those.  I think we didn't get to those points because we were cut off.
Q:     Did it occur to you during the deposition that you had not been asked any questions
       by OMD about the UM job offer
A:     There [are] a lot of questions that didn't get posed and those [were] one of them.
                    *       *       *       *
Q:     And is it fair to say that you were surprised that you were not asked those questions?
A:     I was surprised that I wasn't asked a lot of questions, but again I think that goes back
       to the fact that we didn't have time.

(*Id.* at 149:3-150:11).  As this line of questioning makes clear, Ms. Fryer was never asked whether

she had received or accepted an offer of employment with Kraft, UM or any potential other

employer during the first day of her deposition.  Further, while Defendants ascribe a more sinister

motive to her failure to volunteer this information, Defendants can point to nothing but speculation

and supposition. As Ms. Fryer testified:

There was absolutely no point in [trying to avoid telling Defendants that she had
received a job from Kraft].  No reason.  I came in here to tell the truth and I did to the
best I understood the questions and I never ever in a million years thought I would
walk out of here that day without you knowing that I had a job and that . . . I was
planning on taking one on that following day because you would obviously find out
about it.  (Fryer Dep. II at 179:16-24).[10]

---

[10]     In a continuation of Defendants' personal attacks levied against Ms. Fryer, Mr. Cohen
(thinking he was off the record) insulted Ms. Fryer by responding to the above quoted portion of her
testimony: "That was quite a performance."  (*See* Fryer Dep. II at 180:4-5).

Defendants also contest Ms. Fryer's belief that she obtained the job at Kraft without a second interview, claiming that she perjured herself again.  (*See* Def. Mem. at 20-21).  Defendants argue against Ms. Fryer's explanation that she limited her statement to companies with which she interviewed twice by calling it a "fabricated contention."  (*Id.* at 21).  But, far from a "fabricated contention" devised by Ms. Fryer, the limitation to second interviews is exactly the question that Mr. Cohen asked her.  (*See* Fryer Dep. I at 256:16-20).  Accordingly, it was exactly in line with the question she was asked -- not a "fabrication" as Defendants falsely claim -- for Ms. Fryer to have limited her testimony to companies with which she had interviewed twice.

With responsibility for this limitation resting nowhere but with himself based upon the questions he chose to ask (and not to ask) on Day One, Defendants' counsel resorts to claiming Ms. Fryer really did have a second interview with Kraft.  As previously established, Ms. Fryer's Day Two testimony made clear why this was not the case.  (*See*, *supra*, at p. 8 (quoting Fryer Dep. II at 175:10-176:6)).  It is also telling that after serving a subpoena for the deposition of the Kraft representative who could corroborate that Ms. Fryer did not have a second interview, Mr. Cohen elected, after discussions with Kraft's in-house counsel, not to proceed with that deposition after all.  (*See* Gilly Decl. ¶¶ 13-14; Gilly Decl. Ex. F).  Like Defendants' other claims, therefore, this too does not stand up to scrutiny.  And Defendants have not shown any basis, let alone clear and convincing proof, that Plaintiff should be sanctioned with dismissal of her case.

**B.     A Sanction of Attorneys' Fees and Costs is Not Appropriate Against Plaintiff or Her Attorneys**

Just as dismissal of this action is not an appropriate sanction, neither is an award of attorneys' fees and costs against Ms. Fryer or TWG.  Here again, Defendants do little more than cite to the same line of cases, glossing over that they are inappropriate to the present matter.  *See, e.g., Rybner v. Cannon Design, Inc.*, No. 95 Civ. 0279 (SS), 1996 WL 470668, *2-3 (S.D.N.Y. Aug. 20, 2996) (sanction warranted where plaintiff deliberately omitted information from resume and

repeatedly lied about omitted information during his deposition).  Defendants have not demonstrated that there are any costs and fees which they should appropriately be awarded.

While Plaintiff and her counsel recognize that they could have supplemented their production more expeditiously, it is undisputed that they were in the process of doing so when Defendants learned of her employment with Kraft.  Moreover, all parties understood that Ms. Fryer's deposition would be continued on a second day when Defendants would have had the opportunity (as they in fact did) to engage in more complete questioning using this supplemental production.[11]  Even acknowledging that these supplemental documents should have been produced in a more timely fashion than they were, Defendants have pointed to no case-law entitling them to sanctions on this ground.  In fact, sanctions for the late production of documents is not an appropriate remedy.  *See Convolve, Inc. v. Compaq Computer Corp.,* 223 F.R.D. 162, 169-70 (S.D.N.Y. 2004) (holding that appropriate remedy for failure to produce certain documents, and misrepresentation that such documents did not exist, was full disclosure of relevant information, not sanctions).  Where sanctions were not justified in a situation where a party deliberately withheld documents and represented that they did not exist (*Convolve,* 223 F.R.D. at 169-70), sanctions are not appropriate here where the lack of a more timely supplement was not intentional and no misrepresentations concerning the existence of such documents is even alleged.  To the contrary, Ms. Fryer herself revealed that she had additional job search documents to produce during Day One of her deposition. (*See* Fryer Dep. I at 255:18-256:12).

Likewise, Defendants' final claim that Plaintiff served a <u>false</u> expert report is without merit. First, Dr. Tinari's report does not, as Defendants repeatedly contend, place Plaintiff's economic

---

[11]     While Defendants seek to make much of the fact that Mr. Cohen placed Mr. Filosa on notice that Defendants were not aware of Ms. Fryer's job status (*see* Def. Mem. at 9-10), it is not clear how Mr. Filosa should have responded other than to supplement Plaintiff's production, which he was in the process of doing, as well as continuing her deposition -- which Defendants already expressed was their intent.

damages at over $1 million.  Rather, as explained in detail in the report, it merely provides

projections of Plaintiff's economic damages for up to six years in the future should she remain

unemployed, as she was at the time the report was produced and served, and in no way constitutes a

representation that she would remain unemployed for this period.  There was no guarantee that

Plaintiff in fact would "start a job with a large, well-established corporation," as Defendants claim.

(*See* Def. Mem. at 20).  Indeed, the Court need look no further than the legal profession to find

individuals who believed just a few years ago that their employment was guaranteed when the

largest, most well-established law firms in the country deferred (and even withdrew) the job offers

held by scores of graduating law students.[12]  Further, Defendants fail to recognize that every

economic damages analysis is based, in part, on assumptions regarding the prospect of subsequent

employment and mitigation of earnings that may or may not ultimately prove true.  While, in

retrospect, Plaintiff's counsel should have requested a second extension of the deadline to serve the

expert report in light of Ms. Fryer's accepted job offer with Kraft, the failure to do so in the face of

the Court-imposed deadline does not make the expert report false (especially given that Ms. Fryer

had not actually begun working and deriving income from such employment opportunity).

      While Plaintiff realizes that Defendants may legitimately claim that they incurred additional

expense in beginning to prepare a rebuttal expert report, they make no showing as to why such costs

should be shifted to Plaintiff and/or her attorneys in light of the fact that the cost of these reports are

generally borne by the parties in litigation.  This is particularly true where Ms. Fryer has herself paid

more than $3,500 in expert costs.  Similarly, Defendants cannot legitimately claim that the fact that

Ms. Fryer's job offer with Kraft was not disclosed warrants that she pay the cost of <u>Day One</u> of her

deposition on October 7, 2010 which Defendants (not stopping at their already discredited request

---

[12]     Similarly, as Ms. Fryer testified, she had "been trained over the past year and half through this process to not trust anything until it actually happens . . . [s]o I was not going to let myself feel confident until I actually was sitting at my desk with a computer and actually have a place to be and know that I have a tangible job that I can see and touch."  (*See* Fryer Dep. II at 107:14-108:5).

for payment of Day Two) also falsely assert was "a waste of time." (*See* Def. Mem. at 24). Even a cursory glance at the transcript from that portion of Ms. Fryer's deposition reveals that Defendants spent only negligible time (*e.g.* 8 out of 306 pages) discussing Ms. Fryer's mitigation efforts (*see* Fryer Dep. I at 249:11-257:1), and Defendants obviously do not take issue with the vast majority of her testimony on that date since Defendants were asking the questions. Thus, the costs borne by Defendants in taking Ms. Fryer's deposition bear no relation to any alleged misconduct and were a product of Defendants' counsel being without the time to complete his questioning. Finally, as demonstrated more fully above, Plaintiff and TWG have engaged in no misconduct and as such, should not be responsible for the costs associated with this motion.

Defendants' argument that Plaintiff and her attorneys engaged in a scheme to extract an "inflated" and "exorbitant" settlement is simply false and does not warrant sanctions. (See Filosa Decl. ¶ 3; Gilly Decl. ¶ 20). As previously demonstrated, the settlement discussions reveal that Plaintiff and her attorneys did no such thing. While Defendants also argue that Plaintiff "repeatedly" used the expert report in the context of settlement discussions, they only refer to a single letter where Mr. Filosa merely drew attention to the symmetry between Plaintiff's long preexisting settlement demand and the low end of the expert's range of damages, the purpose of which was to support the reasonableness of Plaintiff's initial settlement demand in an attempt to shake Defendants' from their repeated mischaracterization of Plaintiff's settlement position. Instead, it is plainly evident that Plaintiff and her attorney have not engaged in the sort of conduct that warrant dismissal, let along sanctions, and Defendants' motion is nothing more than a calculated gamble to avoid having to answer the merits of Ms. Fryer's claims.

## **CONCLUSION**

For all the reasons discussed herein, Plaintiff respectfully requests that Defendants' Motion to Dismiss the Amended Complaint and For Sanctions be denied in its entirety.

Dated: April 22, 2011
      New York, New York                  Respectfully submitted,

                                        **THOMPSON WIGDOR & GILLY LLP**

                                        By: /s/  Scott B. Gilly
                                            Scott B. Gilly
                                            Gregory N. Filosa

                                        85 Fifth Avenue
                                        New York, NY 10003
                                        Tel: (212) 257-6800
                                        Fax: (212) 257-6845
                                        sgilly@twglaw.com
                                        gfilosa@twglaw.com

                                        *COUNSEL FOR PLAINTIFF*

26