```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   VIOLET FRYER,

 4                    Plaintiff,

 5             v.                        09 Civ. 9514 (WHP)

 6   OMNICOM MEDIA GROUP, et al.,
                                         Argument
 7                    Defendants.

 8   ------------------------------x

 9                                       New York, N.Y.
                                         May 20, 2011
10                                       3:15 p.m.

11   Before:

12             HON. WILLIAM H. PAULEY

13                                       District Judge

14

15             APPEARANCES

16

17   THOMPSON WIGDOR and GILLY
          Attorneys for Plaintiff
18   BY:  KENNETH P. THOMPSON
          SCOTT B. GILLY
19

20   DAVIS & GILBERT LLP
          Attorneys for Defendants
21   BY:  GUY R. COHEN
          ANDREW KEISNER
22   GEX|NUMSORT

23

24

25
```

1           (Case called)

2           MR. THOMPSON:  Good afternoon, your Honor.  Kevin

3   Thompson and Scott Gilly of the law firm Thompson Wigdor and

4   Gilly.

5           THE COURT:  Good afternoon.

6           MR. COHEN:  Good afternoon, your Honor.  Guy Cohen and

7   Andrew Keisner, Davis & Gilbert, for the defendants.

8           THE COURT:  Good afternoon, gentlemen.  This is the

9   defendant's motions for sanctions.  Do you want to be heard?

10          MR. COHEN:  Yes, I do, your Honor.  Your Honor, this

11  is a motion for dismissal of the lawsuit and sanctions that OMD

12  has reluctantly brought against Violet Fryer and her lawyers.

13  What the facts show, your Honor, is that by September 17th of

14  last year Ms. Violet Fryer had accepted not one but two jobs,

15  one with Universal McCann UM that she ultimately rescinded, and

16  one with Kraft, which she ultimately took.  Each of those jobs

17  provided her with more money and greater salary than she had

18  when she was employed by OMD.

19          The only reason OMD found out about this, your Honor,

20  was pretty much out of pure luck.  About 45 days, a month and a

21  half, after she received that first job, OMD found out from a

22  separate source, not from the plaintiff herself, that she had

23  gotten that job.  The reason that OMD had not found this out

24  was because both Violet Fryer and her attorneys had

25  intentionally decided, in concert with another, to keep this

1    information from OMD in a very clear effort to improve their

2    bargaining position while the parties were discussing

3    settlement.

4          The misconduct here, your Honor, is not limited to a

5    single issue.  It's evidence of a number of different types.

6          We start with the deposition.  Ms. Fryer has attempted

7    to suggest that her deposition was solely a single statement

8    taken out of context.  Entirely not so.  Any reasonable person

9    who would view the videotape of her deposition would see a

10   stretch of about five minutes where Ms. Fryer was doing nothing

11   other than taking steps to mislead, to avoid showing OMD and

12   their attorneys that in fact she had gotten a new job.

13         You see her talking about how all the jobs are either

14   too junior or too senior, about how her household requires that

15   she have an income.  She talks in the present tense, your

16   Honor, quote, that it's difficult, quote, not knowing when is

17   the next job going to come along.  It's frustrating to keep

18   trying and not getting anywhere.  She says, it is frustrating.

19         Well, no.  Maybe it was frustrating, your Honor.  But

20   in fact when she gave that testimony, she knew full well that

21   she was starting a new job with Kraft just two business days

22   after that.  Her testimony, your Honor, was crafted, it was

23   calculated, it was set up precisely to mislead OMD about where

24   she stood, about the fact that she had a new job.

25         That, your Honor, is the context in which she then

1   testified about her interviews, where she mentioned Kraft and

2   she mentioned Universal McCann.  Then she is asked, do you have

3   any second interviews?  Well, with a few of them, she says,

4   either I didn't hear back or I didn't get the job.  That

5   testimony, your Honor, is blatantly false and intentionally

6   false.  No matter how she spins it, there is no way to that

7   around that.

8          What she tries to say is, well, I didn't have two

9   interviews with Kraft.  Even if we accept the premise, the

10  underlying premise, that somehow her answer only related to

11  those companies with which she had two interviews, and I don't

12  think that is a premise that is actually accurate, but even if

13  we accepted that premise, she had an initial interview at Kraft

14  with the individual who ultimately gave her a job.

15         She then sends an email to HR and says hey, thanks for

16  expediting my interview process.  She meets for a half hour

17  with a brand manager in a conference room in Tarrytown, New

18  York, with an individual who has her résumé, talks about her

19  job responsibilities and what she is going to do in the future.

20  You can call that whatever you want, but it's an interview, and

21  she knew it was an interview, because she sends another note

22  the next day, and the note the next day said, hey, thanks again

23  for expediting the interview process.

24         Finally, after two of those interviews, she gets a job

25  with Kraft.  So this testimony that she didn't get the job was

false.

Even beyond Kraft, we turn to Universal McCann UM. There is no dispute, no deputy at all, that prior to the date when she was deposed she interviewed with Universal McCann at least six times. It's not in dispute. So when she said, I didn't get job, that is a false statement.

How does she try to explain that? She comes in a second day a federal court deposition, and she says, well, when I said that I didn't get the job, what I really meant was that although I got it and I accepted it, I didn't ultimately start that job. She says that's what she meant. Your Honor, it's inherently incredible and it's somewhat shocking that an individual would make such a statement in a court of law, in federal court, in a case where sanctions are an issue.

Secondly on the topic of UM, the notion that this was some sort of mistake, some sort of miswording, she testified on the second day of her deposition that she understood perfectly well the importance of information about her new job. She knew if she told OMD about her new job, it would cut off her damages. She knew it was an important factor in her case. She knew it was material. So to try to suggest that when she said "I didn't get the job" what she meant was anything other than that is simply an after-the-fact contrivance, false testimony.

It would be bad enough if that were the only issue here, but it goes well beyond that. The second point here is

1    that they never produced any documents.  They never produced

2    any documents about the fact that she had gotten the job.  They

3    never told us that she had gotten the job.

4           Now, in their opposition papers, your Honor, they come

5    to this Court and they say, I'm sorry, perhaps there was a

6    little law office failure, we didn't keep track of bringing the

7    documents in as carefully as we could, we're going to fix our

8    procedures and make it better.  Your Honor, that's a lot of

9    nonsense.

10          These are not real estate lawyers who took on an

11   employment case just for the fun of it.  Mr. Gilly and Mr.

12   Filosa are very experienced employment lawyers.  They know full

13   well that information about a person getting a new job is the

14   most critical piece of information that any defense lawyer

15   could possibly want to know during discovery in an employment

16   discrimination case.

17          When they showed up at that deposition and they hadn't

18   produced any documents and she then testified, that was not a

19   mistake.  That wasn't law office failure.  It was a conscious

20   choice.  And we know that it's a conscious choice.  In addition

21   to the fact itself, if you look at her testimony, Ms. Fryer

22   very clearly gave misleading testimony that she was prepared to

23   at minimum avoid as best as she could testifying about the fact

24   that she had gotten a new job.

25          Even if we stop for a second, well, maybe Filosa and

1    Mr. Gilly forgot to produce the documents, forgot to tell you

2    about the fact that she had gotten the new job before the date

3    of her deposition, surely Mr. Filosa, when he was sitting there

4    listening to her testimony, at minimum must have realized that

5    this was extremely misleading testimony, at minimum, whether

6    she had gotten a new job.

7           And this misleading testimony was exacerbated by fact

8    that he never corrected it, and it was exacerbated by the fact

9    had that neither he nor Ms. Fryer ever produced any documents.

10   You put all of that together, it's pretty clear what's going on

11   here.

12          Even if we take I one step farther and say maybe it

13   just slipped his mind and he wasn't paying attention, he had a

14   conversation with me, and he doesn't dispute it, where I flat-

15   out said, hey, I hope she finds another job, litigation aside.

16   There was dead silence.  Not a word was said about the fact

17   that she was starting a new job with a new employer just two

18   days after that.

19          So when they come in here and try to say hey, we're

20   correcting things, we're going to make things better by

21   improving our office procedures, that's not trying to take

22   responsibility for their actions, your Honor; it's avoiding

23   responsibility for their actions.

24          And that's not all.  Even before that, your Honor,

25   they served an expert report 17 days after the date on which

1    she first got a job offer.  Ten days after she accepted a job

2    with Kraft, we received an expert report.  The expert has no

3    reference to Kraft, has no reference to Universal McCann.  Not

4    only that, it contains a damages analysis that says that her

5    likely damages are going to be somewhere from $350,000 to over

6    a million dollars.

7         Your Honor, that report was false and misleading on

8    the day that it was served.  Any lawyer who picked up that

9    report, would have read that report and considered it to be

10   tantamount to a representation by counsel and by Ms. Fryer

11   herself that she had not obtained a new job, that she wasn't

12   about to start a new job.

13        The response to that we get is, well, that's not true,

14   it's not a false report, and the reason it's not false is that

15   there was no guarantee that she would start a job with Kraft,

16   and experts all the time make presumptions and assumptions,

17   that's how they do their work.  That's nonsense, your Honor.

18        Yes, it is true there was no guarantee she would start

19   her job with Kraft.  She may get fired from her job with Kraft

20   tomorrow.  But what experts do is they do their reports based

21   on assumptions and probabilities.  There is not an expert

22   anywhere in the world who would have said that she has $350,000

23   to a million dollars in anticipated damages knowing full well

24   that she had gotten a job with Kraft, no fly-by-night

25   operation, and was just about to start a new job.

1          THE COURT:  How much money did the defendants spend

2     preparing a rebuttal report?

3          MR. COHEN:  The amount that was spent on the rebuttal

4     report itself, your Honor, I believe on the expert was

5     somewhere from 7 to $10,000.  I don't know what the amount was

6     that was spent in attorney's fees.  I only know the amount that

7     we received on an invoice, your Honor.

8          The separate excuse they have given is, well, there

9     was a deadline coming for the expert report and we wanted to

10     meet that deadline.  Even if that were so, even if it were

11     somehow the case that they were concerned about meeting the

12     deadline, it would have been a very simple matter to say, hey,

13     we got this expert report in, we had to meet the deadline, we

14     didn't want to call the Court and ask for another extension,

15     but we are going to have to revise this, we are going to have

16     to give you a renewed report.

17          They could have done that the next day.  They could

18     have done it the following day.  They could have done it any

19     day right up to the day on which we contacted them, but they

20     did not do so.

21          Why didn't they do so?  Because what they actually did

22     the very next day was the exact opposite of that.  What they

23     did was instead they sent a document to us, a letter, in which

24     they said, hey, our settlement proposal is perfectly

25     reasonable.  Look, it's on the low end of the economic damages

1    of this report that we just sent to you.  They knew that that

2    information was false and misleading, and they used it as a

3    basis to try to shake OMD up, to get OMD thinking about

4    economic damages when settlement discussions were going on.

5           In their opposition brief, your Honor, they even,

6    quite surprisingly, acknowledge this.  They actually said that,

7    they referred to the expert report in order to support the

8    reasonableness of their settlement demand and they write, "and

9    to shake defendants from their repeated mischaracterization of

10   plaintiff's settlement position."  That is tantamount to

11   acknowledging that they fraudulently induced OMD to make

12   settlement demands.

13          The record, as actually laid out by them in their

14   opposition brief, shows that it worked like a charm.  From the

15   beginning of this case until the middle of September, your

16   Honor, OMD never responded.  Their settlement demand was always

17   $350,000, and OMD never responded to it once.  September 27th

18   they provide the false report.  September 28th they send a

19   letter about the false report.  Over the course of the next two

20   weeks they don't produce any documents, they don't tell us that

21   she had gotten this new job.

22          On October 7th she testifies falsely at her

23   deposition.  That testimony is never corrected.  October 11th

24   is her first day, unknown to OMD, on her new job.  Lo and

25   behold, your Honor, on October 12th, after all of these steps,

1    after all of these actions, on October 12th is when settlement

2    discussions start.

3         Of course, OMD was relying on the information that was

4    provided to it in good faith or we believed in good faith by

5    the other side.  Over the course of the next eight days,

6    through the 20th, there were ongoing settlement negotiations

7    that ultimately were conducted in bad faith because information

8    as I have just laid out for you was very clearly and very

9    obviously withheld.

10        Do we know whether they ultimately would have provided

11   the documents, would have disclosed this information?  They

12   haven't given any information that would show that.  They

13   haven't given any information that would suggest that.  But at

14   the end of the day what is very clear is that they withheld

15   this information intentionally with the absolute clear intent

16   of misleading OMD in an effort to get a settlement that OMD

17   would have thought would have been unreasonable.

18        Your Honor, I've litigated against this firm before.

19   I have litigated with Mr. Thompson.  They are tough lawyers.

20   They are smart lawyers.  They said in their opposition papers

21   that they are lawyers that have worked hard on their reputation

22   for integrity.  I actually don't dispute that.  Frankly, that's

23   what makes it a little bit more difficult.  The fact of the

24   matter is that neither I nor I believe anyone in my office that

25   worked on this case would ever have believed or ever have

suspected that we had been duped, that we had been faked out,
and that is precisely what happened.

The question, then, is what is the appropriate remedy
in this case?  We submit to the Court that the only proper and
appropriate remedy is dismissal of this case along with
monetary sanctions.

As an initial matter, they have argued that even if
everything we said was true, it somehow is not as serious, not
as bad a wrong as the various other cases in which individuals
have had their cases thrown out with prejudice.  They are
simply wrong.

I don't mean to get up on a soapbox here, your Honor,
but the functioning of our judicial system counts on honesty.
It relies on honesty in depositions, honesty in document
production, honesty in expert disclosures.  It relies on
fundamental fairness between parties in their interactions,
particularly when it regards settlement.

I don't know how often this type of behavior occurs.
I can't say.  I'm sure its quite rare that it comes before the
Court.  But at the end of the day, when you have a plaintiff
and their lawyers who all know, who very clearly have worked
together in a multifaceted bad faith attempt to provide
misleading information in order to improve their settlement
position, we submit to the Court that that is as serious as or
more serious than any of the cases in which dismissal has been

1    ordered.

2          In addition, when these cases are analyzed by courts,

3    when the decision is made as to whether dismissal is the

4    appropriate remedy under the circumstances, courts frequently

5    ask the question, well, is this likely to recur and have the

6    individuals who are responsible taken responsibility for their

7    actions?  There have been cases where there has been clear

8    perjury and the court has said, you know what, I'm going to

9    award attorney's fees but they have accepted responsibility for

10   their actions and I'm not going to dismiss the case.

11         That's not what happened here.  Ms. Fryer testified

12   falsely once.  Do we expect that behavior to recur?  We know

13   it's going to recur, because it already has.  She testified

14   falsely at her deposition and she testified falsely again when

15   she tried to weasel out of her prior testimony.  Has she taken

16   responsibility for her actions?  Certainly not.  She denies any

17   wrongdoing to this day.

18         That addresses Ms. Fryer.

19         Then we have to turn to Ms. Fryer's lawyers.  I have

20   to say, as I said to the Court last time we were here, I had no

21   desire to bring this motion, I get no joy out of bringing this

22   motion.  But the simple fact is that to this day the lawyers in

23   this case have not taken any responsibility.

24         To this day they don't acknowledge that this

25   information was withheld in an effort to get an advantage in

1    settlement discussions.  They don't acknowledge that there was

2    anything wrong with that expert report.  To this day they say

3    it's fine.  They say that there was nothing wrong with not

4    having corrected her false deposition testimony.

5            The only thing that they concede is, well, we have put

6    in place slightly better office procedures, which in and of

7    itself ignores the fact that this is several things together

8    that show an intentional plan to try to get a leg up in

9    settlement discussions.

10           At some level it's beyond this.  Not only did they

11   defend these actions, not only did they refuse to acknowledge

12   any wrongdoing, but they treated this as just another

13   litigation matter in which they can just be aggressive

14   tough-guy lawyers.  When I brought this information to their

15   attention and said, hey, look, you've got a problem here,

16   what's going on, how could this have happened, how could I have

17   been misled, what was their response?

18           Not only did they say, hey, we didn't do anything

19   wrong, we didn't do anything vaguely wrong; on top of that, it

20   doesn't affect our settlement position a penny because we think

21   this is frivolous.  They even went so far as to say that if we

22   brought this motion based on the information that we have

23   brought to the Court's attention, the very same information,

24   they would seek sanctions not only against me and against OMD

25   if we had the chutzpah to bring this misconduct to the Court's

1    attention.

2           I think that if the Court were to look at the entire

3    history of how this developed, how all of this played out, it

4    becomes very apparent that this was a litigation tactic, like

5    any other litigation tactic.  Well, it didn't work out, so they

6    are ready to move on to the next step in the poker game.

7           That response to this motion, your Honor, hasn't been

8    the response of lawyers who felt an obligation to provide every

9    piece of information to the Court.  No.  It seems to me they

10   treated it like any other motion in which a lawyer zealously

11   advocates on behalf of their client.  They didn't provide all

12   the information.  They have left out pieces of information.

13   There are any number of items that are laid out in their papers

14   that ultimately are misleading to the Court.

15          Yes, after we saw the Court the last time, it was

16   obvious, apparently, to the plaintiffs that they had to do

17   something a little bit differently, so they begrudgingly

18   acknowledged that perhaps the tide has changed slightly.  But

19   ultimately it's clear that their view is, hey, this is just

20   cutting into our profit margin.  Good show, well done, you've

21   shown us, so our profit margin is a little less and we may end

22   up settling the case for a little less than we otherwise would

23   have settled for.

24          We submit to the Court that that is improper, that

25   that's wrong, and that the message that has to be sent here is

1    that when you break the rules, when you abuse the process, you

2    don't get to break the rules and start again, you don't get to

3    pass go and collect whatever it is that you could otherwise

4    collect.  This was improper conduct.

5           In our view, the only proper remedy, the only remedy

6    that will get the proper message across to Ms. Fryer for her

7    testimony, to her lawyers, and frankly to anyone else out there

8    who would abuse the system in this way, in a way that, as I

9    said, is very rarely before the court, the only properly

10   remedial measure under those circumstances, your Honor, is

11   dismissal of the case.

12          THE COURT:  Thank you, Mr. Cohen.

13          Mr. Thompson.

14          MR. THOMPSON:  Thank you, your Honor.  Your Honor, it

15   is very important at the outset for me to advise the Court that

16   we made mistakes at my law firm.  We should have gathered those

17   job-related documents, all of them, from the client promptly

18   and supplemented our document production promptly.  We should

19   have turned over those job-related documents before Ms. Fryer's

20   deposition was taken on October 7, 2010.  We should not have

21   sent the expert report to the defendants.  We should have also

22   told the defendants that the expert report was going to be

23   revised in a couple of weeks.

24          But those mistakes were mistakes, not acts of

25   misconduct.  The young lawyer who handled the case Mr. Cohen

1    has referred to, Greg Filosa, he believed that there was no

2    urgency in getting the documents quickly to the other side

3    because he felt that the issue of Ms. Fryer's new job was going

4    to come up at her deposition and that he would give the

5    documents over.  We had already produced documents relating her

6    efforts to mitigate her damages.

7         In addition, Mr. Filosa believed, erroneously, that it

8    was better for him to meet a deadline to produce the expert

9    report rather than seek an extension of that deadline.  What

10   happened is he had already gotten an extension of the deadline

11   to produce the expert report, and when September 27th came

12   around, his thinking was I'll produce the report rather than

13   seek another extension and we will revise the report when two

14   things happen.

15        One is Ms. Fryer was scheduled to begin her new job on

16   October 11, 2010.  Weeks earlier, Mr. Filosa believed that he

17   wanted to make sure she in fact had started that job.  He also

18   wanted to get a pay stub from that job to give to the expert

19   that we had retained so he could get the report revised.

20        Now, it may seem completely ridiculous for a lawyer at

21   our firm to think, oh, I'm going to wait to see if our client

22   actually starts working.  But, your Honor, it is a fact that at

23   my firm we had a case, Paulina DeMarco v. Stony Brook Research,

24   where our client was fired from her job because of

25   discrimination, filed a lawsuit, and found a new job, was given

1   a date to start that job.  When the new job found out about her

2   lawsuit, days before she was supposed to start that new job,

3   they revoked the offer.

4        Greg Filosa was the associate on that particular case,

5   so he remembered what happened to Paulina DeMarco, and he

6   thought, I want to make sure that Violet Fryer actually starts

7   her job and doesn't get the job taken away like Paulina DeMarco

8   did a couple of years ago.

9        THE COURT:  When did your partner Mr. Gilly know that

10  Ms. Fryer was starting a new job?

11       MR. THOMPSON:  Your Honor, it is my understanding that

12  Mr. Gilly knew that Ms. Fryer was starting a new job at the

13  time that we sent the report, that Greg Filosa had advised him

14  that she had this job offer and that she had accepted it.

15       THE COURT:  Did Mr. Gilly review the expert report at

16  that time?

17       MR. THOMPSON:  He did not, your Honor.  He did not.

18  But, your Honor, there is something else important in terms of

19  giving the Court context in terms of what happened here.  When

20  this all occurred --

21       THE COURT:  Wait.  You're telling me that Mr. Gilly

22  didn't review the expert report before it was sent to his

23  adversary?

24       MR. THOMPSON:  Yes.  I want to explain what happened,

25  your Honor.  In September the partner who was handling this

1   case had left the firm, shortly before that.  Andrew Goodstadt

2   was the partner who had handled this case from the moment we

3   took it in as a law firm.

4           When Andrew Goodstadt, a partner at Thompson Wigdor

5   and Gilly, left the firm, we had all, the three partners --

6   myself, Mr. Gilly, and Doug Wigdor -- divided Mr. Goodstadt's

7   assignments.  It was a transition.  It doesn't excuse what

8   happened.  But in September of 2010 was a period of transition

9   at the firm.  There should have been stronger, pardon the

10  oversight, obviously.

11          Your Honor, what is important to keep in mind is what

12  opposing counsel is seeking to do here is to make mistakes that

13  we have made and that we concede and turn them into some sort

14  of nefarious plot to suggest that our law firm would abuse the

15  judicial process.  In his papers he says, quote, that we

16  engaged in an unconscionable scheme calculated to enhance

17  Fryer's damages.  There is no evidence, clear and convincing or

18  otherwise, because that never happened.

19          THE COURT:  Why would Mr. Filosa make settlement

20  demands on the basis of an expert report that he knew was

21  false?

22          MR. THOMPSON:  Your Honor, what's interesting about

23  what opposing counsel said today, he said something very

24  interesting that is false.  He said their settlement demand was

25  always 350,000.  Your Honor, Mr. Cohen knows that that is

1    simply not true.

2          Before we ever filed a lawsuit in this courthouse, we

3    made a demand of 350,000 and we reduced that demand to 250,000

4    to the in-house counsel, when who is sitting right here today.

5    So we went from 350,000 before we ever filed the lawsuit, down

6    to 250,000, which ways based on her back pay, her attorney's

7    fees, and her costs to date.

8          When Mr. Filosa, who had not dealt with Mr. Cohen

9    until the date of the deposition and afterwards, spoke to Mr.

10   Cohen about our demand, he maintained it was 350.  Mr. Cohen

11   put more money on the table, and Greg Filosa came down to

12   250,000.

13         What they are trying to convince the Court of is that

14   we used this expert report to somehow extract an exorbitant

15   settlement demand for Ms. Fryer.  That's not what happened.

16         THE COURT:  Isn't it true that once you knew that she

17   had a job, her damages were capped well below that number?

18         MR. THOMPSON:  Your Honor, it is true --

19         THE COURT:  Isn't it?

20         MR. THOMPSON:  Yes, it is true that if Ms. Fryer took

21   that job and actually got earnings.  The revised report shows

22   that her damages were less than what was reflected in the

23   report that we sent.

24         Now, Greg Filosa had spoken to Mr. Cohen's associate

25   in terms of trying to settle the case.  We did not repeatedly

use that expert report to try to get 350,000.  Does opposing
counsel really believe that the partners at my firm would throw
away all the hard work we put into building our firm,
jeopardize the livelihood of our families and our employees,
damage our good name, simply to give Violet Fryer 350,000 or
250,000 for OMD?  That doesn't make sense.

         What happened here, your Honor, what opposing counsel
is trying to do -- and I understand his strategy.  His strategy
is to say Fryer committed perjury, Thompson Wigdor and Gilly
were in collusion with her, and therefore this is such
misconduct that the Court must dismiss her complaint and must
impose sanctions.

         First of all, your Honor, and this is a fact, in their
papers they state, quote, "During October 7, 2010 deposition
Fryer falsely testified that she did not get a job with the
companies with which she had interviews, including Kraft and
UM."

         It is a fact that during her deposition on October 7,
2010, they never asked her whether she received or accepted an
offer of employment from any employer.  In fact, Mr. Cohen, who
took that deposition, specifically asked her:
"Q. Have you worked since you left OMD?
"A. No."

         Then he asked her about companies that she had second
interviews at.  He says, oh, it wasn't really about the second

1   interviews.  It was.  His question specifically to her during

2   the first day of deposition was, quote, and this is on page 256

3   of the first day of deposition, line 16:

4           "And have you had second interviews with any

5   companies?

6   "A. With a few of them."  Then she volunteered this.  "And

7   after I, I didn't, either I didn't hear back or I didn't get

8   the job."

9           What is clear is that --

10          THE COURT:  Isn't that untruthful testimony, "I didn't

11  get the job"?

12          MR. THOMPSON:  Yes.  Your Honor, there were two jobs

13  that Ms. Fryer had offers from.  One was Kraft, where she is

14  working today, Kraft Foods.  The question was whether she had

15  two interviews at any of the companies.  That's what he asked

16  her.  She answered with respect to Kraft.  The answer was no

17  with respect to Kraft because she had one interview with that

18  company.

19          She went back to meet a colleague to find out more

20  about the job that she was going to be doing.  When we

21  interview a number of people, associates, at our firm, we give

22  an offer, and we have them come back to meet our junior

23  associates so they can know exactly what they are going to be

24  doing, who they will be working with.  That's what happened at

25  Kraft.  So she didn't commit perjury with respect to her answer

1    on Kraft.

2           The other company, UM, it's a fact she interviewed at

3    that company about five times.

4           THE COURT:  And she got the job.

5           MR. THOMPSON:  She got the job.  But what she

6    explained, your Honor, and this is important, is that in her

7    second day of deposition Mr. Cohen spent a lot of time, and I

8    would have done the same thing, asking her what she thought

9    when she said, either I didn't hear from them or I didn't get

10   the job with respect to UM.  This is what she said.  She

11   believed, your Honor, when she said, I didn't get the job, what

12   she meant was she did not end up working at the job.

13          THE COURT:  Am I really supposed to accept that

14   explanation as credible?

15          MR. THOMPSON:  What she explained, your Honor, when

16   she made that comment, it was off the cuff.  But I want to

17   direct your attention to something that she said that I do

18   believe is credible.  Mr. Cohen asked her during her second day

19   of deposition, page 179 at line 12:

20   "Q. And is it your testimony as you sit here today under oath

21   that at no point were you trying to avoid telling OMD and its

22   attorneys that you had received a job from Kraft?

23   "A. Absolutely not.  There was absolutely no point in doing

24   that, no reason.  I came in here to tell the truth and I did

25   the best I could to the questions.  I never ever in a million

years thought I would walk out of here that day without you

knowing that I had a job and that I would be starting.  And I

was planning on taking one of those jobs the following day --

taking one on the following day because you would obviously

find out."

THE COURT:  But she did walk out of the deposition

knowing that two days later she was starting a job that she had

already accepted and Mr. Filosa let her walk out of that

deposition leaving that impression.

MR. THOMPSON:  There were two things, your Honor.  One

is Mr. Cohen never asked her, and he admitted later he never

asked her, questions regarding whether she had received any job

offers.  He never asked her that.  She also ended that first

day of deposition early because she had childcare obligations,

which we understood.

THE COURT:  What does that have to do with anything?

MR. THOMPSON:  What it has to do with, your Honor, is

the fact that our client and the lawyer who was defending her

at that deposition believed that she was going to be asked

questions about her job offers.  She was not asked those

questions.  The deposition ended early.  Mr. Cohen was coming

back.  And when she had her second day of deposition she, told

the truth.

This was not an effort to hide the facts.  In order

for the Court to find that we engaged in misconduct, the Court

1    would have to believe that we actually sat there, first of all,

2    that we engaged in this conspiracy with our client to lie about

3    a critical fact when the whole world would see her walking into

4    Kraft Food Company a couple of days later and that we would not

5    be able to hide this fact.

6           At the end of the day, your Honor -- this is

7    important -- we tried to settle this case like we settle all

8    cases.  It wasn't that we needed this expert report.  Most of

9    the cases I settle, Scott Gilly settles, Doug Wigdor settles,

10   we don't have an expert report.  So it wasn't that we needed

11   this expert report.  We told them from day one 350 is our

12   starting demand but we would come down to 250.  And when we

13   filed the case, we still maintained that.

14          Was it a mistake for Mr. Filosa to refer to the expert

15   report in his letter?  Yes, it was.  But it wasn't part of this

16   overall plan where we coached our client to go in there and

17   hide this fact that no one could hide.

18          THE COURT:  Did Mr. Filosa discuss his letter with Mr.

19   Gilly before he sent it?

20          MR. THOMPSON:  He did not, your Honor, he did not.

21          THE COURT:  When did Mr. Gilly review the expert

22   report?

23          MR. GILLY:  May I respond, your Honor?

24          MR. THOMPSON:  I'll have him respond.

25          THE COURT:  Certainly.

1          MR. GILLY:  Your Honor, I appreciate that.  Since this

2     issue has come up following Ms. Fryer's deposition, I've spent

3     a great deal of time reviewing the matter with Mr. Filosa,

4     discussing what had happened that led to the situation that we

5     are facing today, your Honor.  My best recollection is I did

6     not review the expert report until after Mr. Cohen brought

7     these issues to the attention of our firm in his initial letter

8     to Mr. Filosa about this matter.

9          I don't offer it as an excuse for anything that may

10    have been a shortcoming in terms of oversight of this case, but

11    I will concede, your Honor, that in September of 2010 there

12    were a number of matters that I was tasked with taking the lead

13    on transitioning from Mr. Goodstadt's oversight.  This is one

14    that I did not oversee in the fashion that I usually would

15    oversee a case.  I concede that.  It troubles me quite a bit.

16         THE COURT:  Were you aware that Filosa had not

17    disclosed Fryer's job to defense counsel?

18         MR. GILLY:  Your Honor, I was not aware of that fact

19    until it was brought to our attention by Mr. Cohen.  I, again

20    regrettably, was not aware of that.  As I said, since this has

21    come up, it's troubled me a great deal because I have always

22    believed myself to be a lawyer who practices, putting aside

23    allegations of misconduct or sanctionable conduct, who

24    practices law in a manner that is above reproach.  I believe

25    that is the reputation I have.  That's what I have always

27

thought I have done in my career.  It bothers me a great deal

that we did not meet that standard and I did not meet that

standard on this case.

        I do want the Court to know that at no time did I

engage in nor do I believe Mr. Filosa engaged in the conduct

that has been asserted against us here.  We did fall short in a

number of areas.  We did make the mistakes that have been

pointed out.  There is really no excuse for them.  They

happened.  I can't change that.  But I do want to take this

moment to explain to the Court that at no time was this done in

an intentional way to try to mislead anyone.

        MR. THOMPSON:  Your Honor, if I may make a couple of

more comments?  Then I'll sit down.  Your Honor, what opposing

counsel is asking is that the Court impose a drastic sanction

here, the sanction of dismissal, which will bring an end to

this case.  Violet Fryer deserves to have her case decided on

the merits.

        These mistakes that were made were not intentional.

They were not part of any type of unconscionable scheme.

Ultimately, we would respectfully request that she be allowed

to present her case, because if they did not discriminate

against her in connection with her pregnancy, certainly a jury

will reach that conclusion.

        In addition, your Honor, with respect to our law firm,

we have looked at all the cases they have cited.  One of the

comments in their papers that jumped out at me was when they said that our, quote, bad faith subversion of the judicial process is as serious as, if not more serious than, any other dismissal case that is they cited in their moving papers.

Your Honor, we have read your case in Shangold involving the treatment and the Palm Pilot and what you said and what you did in that case. We read the McMunn case that was before Judge Buchwald. We looked at the case Judge Patterson had in Mackel.

At the end of the day, those particular plaintiffs literally lied, cheated, and tried to steal their way through discovery, altered tapes, tried to hide material witnesses, telling other people they are going to commit perjury, a treatment that they said they wrote at a certain point where they referenced Palm Pilot when the term "Palm Pilot" wasn't even in existence. That's not what happened here.

We would ask, if you look at all the factors that courts are asked to consider when determining whether sanctions should be imposed, your Honor, those factors weigh in favor of not imposing sanctions.

Now, opposing counsel is not going to believe that we have taken steps at TWG to make sure this never happens again, but we have. We have told every lawyer, whether they are straight out of law school or ten years practicing, that they must, when they get an expert report and they learn that our

1    client got a job, whether they start the job or not, despite

2    what happened to Paulina DeMarco, they must revise that report,

3    withhold that report, ask the Court for permission to get

4    another extension if necessary, because there would be good

5    cause to do so.  So we'll never have this happen again.

6         Scott Gilly said it better than I could ever say it.

7    At the end of the day, we are all lawyers of integrity.  This

8    is something that pains us because here we are in open court

9    having to admit to mistakes that we have made under the

10   pressure of sanctions.

11        And they have used the threat of sanctions very

12   skillfully here.  When Mr. Gilly came before you in January,

13   and Mr. Cohen, you told them why don't you guys try to resolve

14   this before you file any motions.  Scott Gilly in good faith

15   reached out to Mr. Cohen to see if we could settle this case.

16   They can't deny that Violet Fryer is definitely out of pocket

17   some money.  She was out of work from June 2009 until October

18   2010.

19        Mr. Gilly reached out to Mr. Cohen.  Mr. Cohen told

20   him, we have a settlement offer, OMD will give you this offer.

21   Drop this case with prejudice.  You don't get a dime and we

22   won't file any sanctions, we won't seek any sanctions against

23   you.  And he said, you've got to let us know within 24 hours

24   whether you accept that.

25        Your Honor, I've been practicing for a long time.  I

1     don't think I've ever given opposing counsel 24 hours to get

2     back to me on any settlement demand, let alone a settlement

3     demand like that.

4          At the end of the day, what we would ask, your Honor,

5     is that the Court look at the entire circumstances here.  When

6     Violet Fryer testified the second day and explained her

7     position, whether Mr. Cohen believed her or not, he should not

8     have stood up and said that was quite a performance, like he

9     did.  And in his reply papers he tells us that by continuing in

10     this case, we run the criminal risk of going forward with this

11     case.

12          Your Honor, we did not engage in misconduct.  We stand

13     by that.  We made mistakes.  We would respectfully request that

14     you take that into account in reaching your decision.

15          Thank you.

16          MR. COHEN:  May I make a few brief comments, your

17     Honor?

18          THE COURT:  Briefly.

19          MR. COHEN:  The brief comments are these.  The one

20     thing that I do regret in retrospect was that when I deposed

21     Ms. Fryer I made sure there was not a single loose end

22     available, that there was no wiggle room for her to tell

23     another story.  I was never going to be able to get the

24     communications between Mr. Filosa and Ms. Fryer.

25          But it was my expectations, and perhaps I was still

31

1    being naive in assuming that Mr. Gilly and Mr. Filosa were

2    going to provide the Court with their own complete and full

3    accounting of everything that occurred so that I would not have

4    had to have taken their depositions and gotten all of the

5    details.  As a result of that, the Court was left to ask some

6    questions, and there are some questions left hanging out there.

7            I would suggest to the Court that although certainly

8    Mr. Filosa is the primary person responsible for what's

9    happened here, the notion, the effort to sort of throw him

10   under the bus is disingenuous at best here.  There was never a

11   full accounting provided at all.  If you go back and look at

12   the declarations, you can see they are providing information

13   that they think is useful as opposed to the information that

14   they should have fully and completely provided to the Court.

15           The second point I want to make is there is no point

16   in having a debate over who is reasonable or who isn't

17   reasonable.  I would say without any uncertainty you don't go

18   to Thompson Wigdor with a starting position that is anything

19   but tough, because that is the way that they are going to

20   operate.

21           At the end of the day, Mr. Gilly told me, I want a

22   hundred thousand dollars or the case is not going to settle.

23   Fair enough.  That's his position.  I'm OK with that.  We

24   weren't going to do that.  It's not for anyone to say who is

25   reasonable, who is not, but that's where the case was left.

1          Finally, I want to point out that both Mr. Gilly and

2     Mr. Thompson are excellent lawyers.  Mr. Thompson was not going

3     to come into this courtroom and show you anything other than

4     contrition, attempt to show you that they have made mistakes,

5     attempt to show you that they have done things wrong and they

6     are going to change it.

7          I would encourage you to go back and look through the

8     record of this case.  Look through the record of the case in

9     October of 2010, when I guarantee you Mr. Gilly was the person

10    signing off on Mr. Filosa's letters.  Let's see how contrite

11    they are then when they write a letter back to me and say we

12    are not touching our settlement demand or we are going to bring

13    sanctions against you.  Every step of the way they take a step

14    back and a step back and a step back because they forced us to

15    come forward and push this to this point.

16         I would submit to the Court that at this point it's to

17    a little and too late.  If the Court goes over the progression

18    of events and what's happened here, that is far more critical

19    and far more important than Mr. Thompson's and Mr. Gilly's very

20    well spoken statements.  I would have expected nothing less of

21    them today.

22         I'd rather look back to the earlier times when they

23    looked at this case and said, hey, you're not so tough over

24    there, we're going to cross-examine her at trial if you don't

25    like it, pal.  That's what happened back at the end of 2010.

1   That's what happened every single day until the day that we

2   walked into your robing room to discuss the pretrial, to

3   discuss our requests to make this motion.  I would submit that

4   those are the factors more important than any statements that

5   Mr. Gilly or Mr. Thompson made here today.

6           THE COURT:  We are going to take a five-minute recess.

7           (Recess)

8           THE COURT:  Before this Court is defendant's motion

9   for sanctions based on allegations that Ms. Fryer and her

10  counsel, Thompson Wigdor and Gilly LLP, intentionally misled

11  the defendants and their counsel about Ms. Fryer's potential

12  damages and new employment.

13          A court "has the inherent power to do whatever is

14  reasonably necessary to deter abuse of the judicial process and

15  ensure a level playing field for all litigants."  Shangold v.

16  Walt Disney Co., 03 Civ. 9522 (WHP), 2006 WL 71672 at *4

17  (S.D.N.Y. January 12, 2006); see also Residential Funding Corp.

18  v. DeGeorge Financial Corp., 306 F.3d 99, 107 (2d Cir. 2002).

19          The Second Circuit generally requires "a finding of

20  bad faith for the imposition of sanctions under the inherent

21  power doctrine.  That bad faith must be shown by (1) clear

22  evidence or (2) harassment or delay or other improper

23  purposes."  DLC Management Corp. v. The Town of Hyde Park, 163

24  F.3d 124, 136 (2d Cir. 1998).

25          Whether dismissal is appropriate as a sanction is

within the discretion of the district court.  See Dodson v.
Runyon, 86 F.3d 37, 39 (2d Cir. 1996).  "The Second Circuit,
however, has long recognized that dismissal is a harsh remedy
not to be utilized without a careful weighing of its
appropriateness and repeatedly noted that one of the factors
that should inform a trial court's decision is the suitability
of lesser sanctions."  Shangold, 2006 WL 71672 at *4 (citations
omitted).

       In this case there is clear evidence that Ms. Fryer
and her attorneys attempted to conceal the fact that she had
been offered and had accepted new employment.  By September 27,
2010, Ms. Fryer had been offered a job at Universal McCann; had
accepted the Universal McCann position; had rescinded that
acceptance; had then been offered a job at Kraft; and had
accepted the Kraft position.

       Yet at her October 7, 2010 deposition, nearly two
weeks later, when asked about second interviews with any
companies in the previous months, Ms. Fryer testified that
either she "didn't hear back" or she "didn't get the job."
That testimony was false.  It is also highly misleading,
because it is clear from the tenor of the deposition and the
questioner's earlier inquiries that he was interested in
whether Ms. Fryer had obtained new employment.  Ms. Fryer's
explanation that when she said she "didn't get the job" she
meant that "she didn't end up with the job" is preposterous.

1          As to the conduct of Ms. Fryer's counsel, Thompson

2     Wigdor and Gilly, on September 27, 2010, the firm served an

3     expert report estimating Ms. Fryer's past and future losses as

4     between 350,000 and $1 million based on the assumption that she

5     was unemployed.  Since Ms. Fryer had accepted the position at

6     Kraft on September 26th, those estimates were inaccurate on the

7     day the report was served.  Nevertheless, Thompson Wigdor

8     neither disclosed that Ms. Fryer had accepted the Kraft

9     position nor provided documentation concerning her other

10    interviews or the Universal McCann position despite having had

11    numerous opportunities to do so.

12         For example, Thompson Wigdor could have disclosed this

13    information (1) on October 5, 2010, when it provided Davis and

14    Gilbert with the documentation underlying the expert report,

15    (2) on October 7th, during Ms. Fryer's deposition, or (3) at

16    any time during couple's regular settlement discussions between

17    October 12th and October 20th.

18         Under these circumstances, it appears that Thompson

19    Wigdor's conduct concealed Ms. Fryer's new employment and

20    leveraged the false expert report in order to extract a

21    favorable settlement amount.  Indeed, during settlement

22    negotiations Ms. Fryer's counsel Mr. Filosa represented that

23    her settlement demand was reasonable because it was at the

24    bottom end of the false damages estimate.

25         Moreover, Thompson Wigdor's argument that it acted in

1   good faith is belied by the fact that rather than disclosing

2   Ms. Fryer's new employment, it waited until defendant's counsel

3   discovered that information on its own.

4          And, perhaps most importantly, as an officer of the

5   court, Mr. Filosa should have recognized that Ms. Fryer's

6   deposition testimony would mislead defendant's counsel into

7   believing that she had not obtained new employment.  That

8   became perfectly clear to this Court when I reviewed Ms.

9   Fryer's video deposition.  The words are in the transcript.

10  The body language and evasion is on the videotape.  It's

11  shocking and deeply disappointing to this Court.

12         Accordingly, this Court finds that sanctions are

13  appropriate.  However, this Court declines to impose the

14  sanction of dismissal.  While defendant has suffered some

15  prejudice, the primary harm resulting from Ms. Fryer's and

16  Thompson Wigdor's conduct is to the judicial process itself.

17         Under the circumstances, this Court finds that a

18  sanction of $2500 against Ms. Fryer and $15,000 against

19  Thompson Wigdor appropriate.  I am going to require those

20  payments to be made to the Davis & Gilbert firm to reimburse

21  them in part in connection with this matter.  Barring a showing

22  of hardship on Ms. Fryer's part, I'm going to require those

23  payments to be made within 45 days.

24         I will enter a very short order on the docket

25  reflecting this ruling.  This constitutes the decision of this

1    Court.

2               Anything further?

3               MR. THOMPSON:  No, your Honor.

4               MR. COHEN:  No, your Honor.

5               THE COURT:  This matter is concluded.

6               (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25